WINTHROP S. GILMAN *et al.,* Complainants in original bill, Appellants, *v.* ELIZABETH HAMILTON *et al.,* Appellees, and GRUNDY H. BLACKBURN *et als.,* Complainants in cross bill, *v.* TRUSTEES of ILLINOIS COLLEGE, NATHANIEL COFFIN *et al.,* Respondents, also Appellants.

16  225
70a 585
16  225
171 450

### APPEAL FROM SANGAMON.

The courts have adopted and administered charities upon *cy pres* principles, with the view of sustaining and carrying into effect the intention of the donor, but are not authorized to change the object or place, because the fund could be more efficiently or judiciously applied in another place, or to a different object.

A charity must be accepted upon the terms proposed; it cannot be altered by any agreement between the heirs of the donor, and the trustees or donees.

The intention of the donor of a charity will control, unless that is impracticable; in that event, it may be altered *cy pres.*

Where, upon a bill filed for a specific performance by a transfer of land, a decree for that purpose is entered, it is not a judicial sale, and any one purchasing from either party is chargeable with notice, as *lis pendens,* of all that is involved in the suit.

Such a case does not come within the general rule, that an innocent purchaser, without notice, will be protected, under an erroneous, voidable or even fraudulent decree or judgment.

A trust is stamped upon the property itself, and will follow it into the hands of those who acquire it by purchase or otherwise, and converts the holder into a trustee, connecting him with all the responsibilities of the trust to the extent of his acquisition.

ABOUT the year 1835, Gideon Blackburn, proposed to various benevolent persons, the following plan for raising money for the purpose of founding and establishing a Theological Seminary in Illinois: That they should advance to him money, with which he should purchase government lands at one dollar and twenty-five cents per acre. That he should convey to them respectively of these lands, amounts which at two dollars per acre would be equal to the sums advanced. That of the remaining lands he should take one-third to his own use, to reimburse him for his trouble and expenses, and the other two-thirds should constitute a fund for the founding and establishment of the college. In other words, five-eighths of the lands thus purchased should be conveyed to the persons who advanced the money, one-eighth

15

to himself, leaving one-fourth to constitute the seminary fund.
In the execution of this plan, he raised funds with which he
purchased over sixty-four thousand acres of land, thus providing
a seminary fund of over sixteen thousand acres. On the 28th
day of September, 1837, Dr. Blackburn executed and acknowl-
edged a deed of trust, conveying to W. S. Gilman and six
other trustees, the said lands constituting the seminary fund,
and some other lands, in trust, for the purpose of establishing an
institution of learning, on the principles in the deed specified.
The deed directs the trustees to procure, from the legislature of
Illinois, an act of incorporation for the institution, if practica-
ble, to which they shall convey the lands and transfer the funds,
constituting the fund of the institution; and until such act of
incorporation shall be procured, it authorizes the trustees, to
sell, mortgage or lease the said lands, and to apply the avails
thereof " to the founding and upbuilding of an institution of
learning, the object of which shall be to promote the general
interests of education, and to qualify young men for the office
of the gospel ministry, by giving them such suitable instruction
in the Holy Scriptures, as may enable them to perform the duties
of that high and holy vocation, acceptably in the world." The
deed provides for the appointment of other and additional trus-
tees, and for filling vacancies; and provides with considerable
detail for the government of the institution, and reserves to the
grantor, the right of visitation. In the deed, immediately fol-
lowing the description of the premises conveyed, and the
*habendum*, this clause appears: " On the following trusts and
conditions: that the said south-east quarter of the south-east
quarter of section twenty-one, and north-east quarter of the
north-east quarter of section twenty-eight, township ten north,
of range seven west, be the site for the permanent location of
the institution hereinafter mentioned, the said parcels of land
having been purchased by the said party of the first part, and
other funds of the institution, for that express purpose."

The trustees applied to the Legislature at the session of
1838–39, for an act of incorporation, and in February, 1839, an
act was passed creating them a corporation. This act the trus-
tees refused to accept, on account of alleged incompatibility
with the provisions and trusts of the deed. In August, 1838,
Dr. Blackburn died intestate, leaving eight children his heirs at
law, several of whom were infants, and one of whom had died
before the filing of the original bill in this suit. The trustees
sold portions of the land from time to time, for the purpose of
paying taxes on the residue, etc., but made no attempt to pro-
ceed with the erection of the institution.

On the 5th of July, 1844, this original bill was filed by the

trustees, making the heirs of Dr. Blackburn, defendants; in which they set forth the above facts. They further state that by the use of trust funds in hand, and by further sales of the real estate, they might succeed for several years to come, in paying the taxes, which amount annually to from two hundred and fifty to three hundred dollars; but that they are satisfied, that if some more active agency than they were then employing or could conveniently employ in the enterprise, is not resorted to, the sales of said real estate will fritter down to a point, where it will be necessary for some one to advance the taxes, or the land will have to be sold in default of the payment of them. They then suggest that the best disposition which can be made of the fund, is to convey the same in trust, to the trustees of Illinois College, for the organization and advancement of a theological professorship in that college, to be called the Blackburn Theological Professorship; and they pray, that the court may decree that the lands and other trust property and money, may be conveyed to the Trustees of Illinois College for the purpose of establishing a Theological Professorship in said college, to be called the Blackburn Theological Professorship.

A decree was entered in accordance with the prayer of the bill, except that it directed one of the trustees to retain in his hands sufficient of the trust funds, to reimburse certain persons at Carlinville the amounts which they had subscribed and advanced to Dr. Blackburn, for the purchase of the two lots designated in the deed of trust, for the site of the institution, and that the same be paid to them. This decree was executed by the trustees, and conveyance made to the Trustees of Illinois College, of all the lands held by the trustees, for the purpose of establishing the specified professorship.

The Trustees of Illinois College sold the lands, most of them to Nathaniel Coffin, by which they raised a fund of ten thousand dollars, with which they endowed the designated professorship, which they established in that college, and appointed the President of the college to that professorship.

This decree was subsequently reversed by this court, without deciding the main question, because it did not appear that there was evidence to sustain the bill now presented by this record, and which was not then brought before the court for its consideration.

After the suit was remanded to the circuit court, an amended bill was filed, making the Trustees of Illinois College and the grantor, parties, as well as many of the original donors of the fund with which the land was purchased; also a cross bill, answers, etc.; but it is deemed unnecessary to state them

further, for the purpose of showing how the questions arose, which the court deems it necessary to examine in the decision of this case.

Upon the second hearing in the circuit court, it was decreed that neither the trustees of Illinois College, nor Coffin, their grantee, derived any title under the original decree and the conveyances made in pursuance thereof, but that the entire trust fund still remains vested in the trustees, under the deed of Dr. Blackburn, or in the survivors of them. The decree then proceeds to appoint several trustees in the place of those who had died, resigned, refused to act, or had removed from the State; and directs them to proceed to sell the lands, and with the avails, to erect the necessary buildings, and to establish the institution in pursuance of the directions of the deed of trust, having first reimbursed the trustees of Illinois College, and their grantee, what they had expended in paying taxes, etc.

The decree in this cause was entered at November term, 1854, of the Sangamon Circuit Court, Davis, Judge, presiding.

D. A. Smith, and A. Lincoln, for Appellants.

W. Weir, Jr., for Appellees.

Scates, J. It would seem by the first decree in this case in 1845, and the opinion of the supreme court reversing it, in 12 Ill. R. 260, that no evidence had been produced, but a decree *pro forma* upon agreement to some extent, had been entered. It is further very apparent from the decree, though not its strict phraseology, that a scheme for the application of this charity upon an assumption of the failure of its objects, and upon the principle of a *cy pres* application of it, had been digested and agreed on between the trustees of the fund, the contestants in the suit, and the contemplated trustees of it, for the new object.

This scheme does not appear to have been adjudged necessary by the chancellor, by reason of a failure of a plan of the founder, nor to have been originated, matured or sanctioned by him, upon this hypothesis. I am not able to resist the impression that the chancellor was only asked to become the passive instrument to record the arrangement and agreement of the parties, by way of a decretal sanction.

This scheme as set forth in the decree, shows a palpable violation of this trust in two particulars. First, a waste or destruction of a part of this fund, by returning to part of the original donors, $1,075, in satisfaction of their donations as creditors upon the fund, and showed the application of the remainder

to another and different, though kindred, object, at a different place.

One of the express trusts, I might say, conditions, of the deed appointing the trustees, declaring the trusts, and conveying the lands and other funds, was, "that the S. E. ¼ of the S. E. ¼ of section 21, and the N. E. ¼ of the N. E. ¼ of section 28, in T. 10 N., R. 7 W., be the site for the permanent location of the institution hereinafter mentioned, the said parcels of land having been purchased by the party of the first part, and other friends of the institution, for that express purpose."

And the objects expressed, were, upon this site to found and build up " an institution of learning, the object of which shall be to promote the general interests of education, and to qualify young men for the office of the gospel ministry, by giving them such instruction in the holy scriptures as may enable them to perform the duties of that high and holy office, acceptably and usefully in the world."

The fund was mostly in land, which continued for eight or ten years to be of little value and insufficient for the erection of buildings, and the endowment or support of the institution. This is the only reason I have heard assigned, to show the impracticability of executing the trust, and a failure of the objects of the charity. I do not think this satisfactory evidence. It may not now, but may be sufficient at a future day for that purpose.

But I might admit even a conclusion that it never could become sufficient, and still it may not show a total failure of the charity; others may contribute, other means and funds may be obtained, and the end accomplished.

Very few donations of this kind are alone sufficient to accomplish fully the designs and objects of the benevolent. Should all donations be tested by a rule of sufficiency in themselves, there would be but few that might not be diverted from the original purpose, to some other as near like it as could be readily found, and especially would this be true, of the foundation or first donation beginnings. We have few educational institutions however well endowed, at this day, whose earliest donations might not have been diverted for the same reasons.

Neither can I admit a long prospective delay and inadequacy, as showing generally a sufficient ground of interference of the chancellor, especially as the trustees may, by a judicious management of the fund, accumulate by its income or enhancement in value.

I should hardly allow myself to doubt that the benevolent donors of these funds, and especially Dr. Blackburn, contemplated that the institution might and would ultimately become

large, popular and useful, but he could not have indulged the idea that the funds he conveyed were sufficient to carry his hopes and plans into immediate and full effect. He certainly would have made a contingent provision of the funds, had he not contemplated the persevering efforts of the trustees. The fund could not have been sufficient, at the time he donated it, to accomplish all that we may and must presume to have been intended, as an ultimate result of the effort.

But it by no means follows, that the object of this enterprise is wholly defeated, and the charity become wholly impracticable, because the funds are inadequate for such a scale of operations, as are our better endowed and older colleges and seminaries.

No one, I presume, would be willing to say that the fund of upwards of fourteen thousand acres of land, is not sufficient, to a certain extent, and in a certain degree, useful and profitable in founding and building up an institution of learning, and calculated to promote the general interests of education, and could be made to contribute towards the qualifying of young men for the ministry, by teaching them the holy scriptures with a view to the ministry.

Humble and obscure as might be the scale of operations fixed by this fund, it might not therefore be the less apostolical, pure or effectual. In view of the character of the donor, as an able, learned and pious divine, we are not at liberty to fix our minds upon a scale of magnificence, as that alone contemplated by him, and abandon the object altogether, because the means justify a scale and extent of operations too humble.

Such an interpretation of his views and intentions might be as little complimentary to his wisdom and piety, as it would be beneficial to posterity, and the cause he labored to promote.

He was not a stranger to the Illinois college. He had been both trustee and agent of it, and assisted it in its struggles and difficulties. He could not have overlooked the advantages of bestowing the fund upon it, for the endowment of a theological professorship in it, had the plan of the institution had no influence in his mind.

But his own residence, and that of several other donors, was in the immediate vicinity of the site selected, and must have had its due weight in influencing their liberality for its object. The plan, locality or site of the institution is evidently a part of this trust. It is not the province of the trustees or the chancellor, to inquire into or determine whether the plan and object of the charity are the most judicious, but only into the intention and means designated. There can be no doubt that the funds can be applied to educational purposes at the place designated, including instruction in the holy scriptures, with reference to a

preparation for the ministry. I have seen no authority upon the doctrine or principle *cy pres*, or otherwise, authorizing the court or trustees to change the object or place, because the fund could be more efficiently or judiciously administered in another place, or applied to a different object.

The courts have adopted and administered charities upon *cy pres* principles, only with the view of sustaining and carrying into effect the benevolent intention of the donor. 2 Story Eq. Jurisp., Secs. 1168 to 1177, and notes; *Curling's Administrators* v. *Curling's Heirs*, 8 Dana R. 38; *Attorney General* v. *Wallace's Devisees*, 73 Munroe R. 617; *Hadley* v. *Hopkins*, Acad. 14 Pick. R. 252; *Beall* v. *Executors of Fox*, 4 Ga. R. 420.

The case of Alexander Slarens, 7 B. Munroe R. 351, is a good illustration. The object of the donors was to procure a suitable place for public worship, and when the Methodist portion of the donors were in a condition to supply their wants, by the erection of a strictly denominational church, and the Baptist to pay for their interest in the partnership one, the arrangement for the sale of the interest of the one to the other, more fully carried out the original intention of the donors.

The charity must be accepted upon the terms proposed. It cannot be altered by any agreement between the heirs of the donors, and the trustees or donees. But it will be carried into effect according to the intention of the donor, and in like manner the mode of its execution will be pursued when indicated, unless the one or the other become impracticable, then, if at all, and then only, may it be altered *cy pres*. 2 Story's Eq. Jurisp. Secs. 1175, 1176.

The remaining question, in relation to the effect of the reversal upon the rights of Illinois College, as new trustees, and N. Coffin, as their grantee, if presented fairly and fully in this record, I find great difficulty in adjusting in a manner to do equity and justice, and afford protection to all the interests involved.

The general rule stamps the character of the trust upon the property itself in the hands of every one who acquires it by purchase or otherwise, with notice of the trust, and converts such holder into a trustee, and with all the responsibilities of the trust to that extent, (2 Story Eq. Jurisp., Secs. 1207, 1207a; *Hoxie* v. *Carr*, 1 Sumner R. 192); and, by another general rule of law, no man can make his ignorance of law to excuse his acts or protect his rights.

Coffin assumed to be an innocent purchaser without notice under the former decree.

How far can this position protect him under the pleadings and proofs in this record?

A few general principles more will lay·the foundation for its consideration.

It is true, as a general rule, that an innocent purchaser, without notice, under an erroneous, voidable, or even fraudulent decree or judgment, is entitled to protection, whether collaterally ,or directly attacked, by reversal or writ of error. *Simms and Wise* v. *Stockum,* 1 Cond. U. S. R. 539 ; *Fletcher* v. *Peck,* 2 ibid. 320 ; *Voorhees* v. *The Bank U. States,* 10 Pet. U. S. R. 472 ; *Parker's Heirs* v. *Anderson's Heirs,* 5 Monr. R. 445 ; *Benningfield et. al.* v. *Reed and Sutherland,* 8 B. Monr. R. 102 ; *Medena's Heirs* v. *Hopkins,* 12 ibid. 602 ; *Morrell* v. *Lawrence et al.,* 12 John. R. 312 ; *Clarey et al.* v. *Marshall's Heirs,* 4 Dana R. 98 ; *Beebee* v. *Ashley,* 2 Gilm. R. 165.

This is a sound policy, and necessary for the assurance and protection of the public ; for while the doctrine of *caveat emptor* applies to these sales as to the title of property, the risk should not be increased by including in it the validity of the decree or judgment against all allegations of error. Of course, no title can be derived through or under a void judgment or decree.

Is Illinois college, or Coffin either, such a purchaser? and had they no notice? I am of opinion they were not.

The bill did not seek a sale, and no sale was decreed ; no sale was necessary to the full execution of that decree, and none was made under it. It was a simple transfer, notwithstanding the decree directs the old trustees to bargain, sell and convey to the new trustees of the " scheme " adopted in lieu of the original design.

The consideration was the same as that of the original trustees ; and that was the undertaking to perform the trust. This transfer of title and the sanction of the " scheme," were the only objects of the bill. There was no judicial sale or purchase, in the sense of the authorities on the subject.

Where a bill is filed for specific performance by a transfer of land or property from vendor to vendee, a decree for that purpose is not a judicial sale ; it is rather a specific execution or enforcement of a former, than the making of a new sale ; under such circumstances, any one purchasing ·from either party, is chargeable with notice of all that is involved in the suit, as a *lis pendens,* and its ultimate effects and consequences upon the property and the rights and powers of the parties.

This doctrine is very fully and ably discussed and applied in several cases in the Kentucky courts. The first case I notice, was in 1845, in *Talbott's Executors* v. *Bell's Heirs,* 5 B. Monr. R. 323. The title was in a trustee ; a bill had been filed and a decree obtained against the *cestui que trust,* for a conveyance,

which had been actually made by the trustee, to fulfill the decree, and the transferee had sold to another, and both denied all notice of the trust. The decree was reversed, and all the sales made pending the cause until the reversal, and depending upon the decree, failed with the decree.

The same rule had been laid down in 1836, in *Clary et al.* v. *Marshall's Heirs*, 4 Dana R. 99.

Where, on a bill for the conveyance of 5,000 acres, a decree had been reversed for 559 acres more, which had been sold and conveyed by the complainant, after the decree, and before its reversal, the court admit the rule in relation to the validity of sales made under voidable judgments or decrees; but they distinguish it from, and deny its application to, cases like this.

They say the complainant was not a purchaser under the decree in his favor. "The decree erroneously gave him that to which he was not entitled, and the subsequent nullification of that decree, necessarily divested him of all semblance of title derived *only* from the decree. Nor do his vendees stand in the attitude of purchasers under a judgment or decree of court. They voluntarily bought of him that to which he had an ostensible judicial right, but they had bought it not under the authority, or at the instance of a court, or any officer of the law, and certainly took it as *his* title or *his* responsibility, and subject to all the contingencies to which the title of the vendor is ever liable. They bought only his right; they bought it from *him*, and could not have acquired thereby a better or any other right than he had. His right was liable to defeasance; this they must have known, or should be presumed to have understood. *His title has been defeated*, and therefore *theirs*, which was only derivative and *dependent entirely* on *his*, must also have failed at the same instant."

This is again confirmed in *Debill* v. *Foxworthy's Heirs*, 9 B. Monr. R. 220, and *Madison's Heirs* v. *Hopkins*, 12 B. Monr. R. 600.

I cannot present the force of this reasoning better, nor does it occur to me as liable to legal criticism for unsoundness.

These cases very properly, I think, treat the purchaser as a purchaser *pendente lite*, chargeable with notice; and he need not therefore be made a party, except at the election of the complainant, (Story's Eq. Pleading, Sec. 156,) unless it be to compel him to perform the trust. Ibid., Secs. 155, 351, 351a.

But the new substituted trustees are very properly before the court, either to charge them with the execution of the trust, or to re-convey the legal title to remove cloud from it, (Ibid); and for the additional reason that they had become trustees and parties in interest, by the decree, by operation of law, and not by

the voluntary act of the parties.    9 B. Monroe, 231; *Sedg-wick* v. *Cleveland*, Paige R. 290, 182.   For the decree had directed the transfer of the title and trust to them.    And to this extent it is upon the same principle of judicial sales.

The trustees of Illinois College cannot allege a purchase for a valuable consideration without notice.    Coffin's right can be no broader than theirs.    They and he must be presumed to have notice of everything in the decree, through which both are com-pelled to trace title.    It is a link in their claim.    The College must be deemed and treated as parties to that decree, for a trans-fer to them was a prime object in that bill.    After the convey-ance to them, Coffin acted in reference to the disposal of their lands, including these, as their agent, to manage and sell for them.    His position and employment in the agency give grounds of the strongest influence of notice in fact, or what is equiva-lent until rebutted.

A presumption of his acquaintance and knowledge of the chain of title to the lands, so far as it depended upon the decree which made the necessity of keeping up a distinction between the proceeds of these, and the other lands he was managing and selling for them.

But if the other ground upon which I have mainly placed my conclusions, be correct, as I have no reason to doubt it is, this question of actual or constructive notice is not essential in this case.

I am, therefore, of the opinion the decree be affirmed.

*Decree affirmed.*