(No. 25942.—

THE VILLAGE OF HINSDALE *et al.* Appellees, *vs.* THE CHICAGO CITY MISSIONARY SOCIETY *et al.* Appellants.

*Opinion filed December 16, 1940.*

222

WHEELOCK, NEWEY & MACKENZIE, for appellant The Chicago Congregational Union; and HARRY P. PEARSONS, (CHARLES M. HAFT, of counsel,) for other appellants.

CHARLES L. COBB, for appellees.

Per CURIAM: A decree of the circuit court of DuPage county construed a deed of Daniel K. Pearsons, conveying six lots in the village of Hinsdale to the village for the purpose of creating a charitable trust. The decree granted relief substantially as sought by the plaintiffs, the village of Hinsdale and the board of library directors of the village, and denied the relief asked by the Chicago Congregational

Union, a defendant and also a counter-claimant, and Harry P. Pearsons, a grand-nephew and other heirs-at-law and next of kin of Daniel K. Pearsons, deceased, likewise defendants and counter-claimants.

From the stipulated facts it appears that for many years prior to September 7, 1911, Daniel K. Pearsons, a resident of Hinsdale, owned and occupied as his residence property which may be sufficiently described as lots 17 to 22, inclusive. Pearsons, then a widower with no living children, was considered a wealthy man, was interested in and had made substantial contributions to educational and charitable activities. Nearly a quarter of a century before, in 1887, he had been one of the incorporators of the Hinsdale Library Association, a corporation not for profit. The library was located in a residence, thereafter in a stationery store and, in 1892, at a village election it was voted to establish a public library. The next year, Pearsons was elected one of the initial directors but declined the election. Upon the establishment of the Hinsdale Public Library, the Hinsdale Library Association turned over its assets to the public library and ceased to function. In 1911, the library was occupying modest quarters under its third lease. Prior to September 7, 1911, Pearsons had expressed to the trustees of the village his desire to give his residential property to the community for library uses and purposes. A committee of ten, including certain village trustees and members of the board of library directors, conferred with him about the proposed gift and as a result of the discussions Pearsons, on the day last named, executed and delivered to the village of Hinsdale his warranty deed conveying to it the property previously described. The deed reads as follows:

"THIS INDENTURE WITNESSETH, that the Grantor, Daniel K. Pearsons, Widower, of the Village of Hinsdale, in the County of DuPage, and State of Illinois, for and in consideration of the sum of One (1) Dollar, in hand paid,

Conveys and Warrants to the Village of Hinsdale, of the Village of Hinsdale, County of DuPage and State of Illinois, the following described Real Estate, to-wit: Lots Seventeen (17), Eighteen (18), Nineteen (19), Twenty (20), Twenty-one (21), Twenty-two (22) of Block Seven (7) of the Re Subdivision of Lots Five (5) and Six (6) of O. J. Stough's addition to Hinsdale, being the block bounded in the North by Walnut Street, on the East by Grant Street, on the South by Maple Street and on the West by Vine Street, situated in the Village of Hinsdale, in the County of DuPage, in the State of Illinois, hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of this State of Illinois: Provided that as to that part of the above described realty, described as follows: Lot Nineteen (19), the same shall be held in trust to be used as a site for a Public Library Building, to be known as the Pearsons Library, and provided further that the proceeds of any sales, or other dispositions of the whole or any part or parts of the remainder of said tract shall constitute a trust fund, for the construction, and maintenance of said Library. It is made an express condition of this conveyance, that, if at any time hereafter, the said Lot Nineteen (19) shall cease to be held and used for library purposes, the title of the said grantee thereto shall thereupon cease and determine, and the remainder shall pass to and the title be vested in the Chicago City Missionary Society, of the City of Chicago, Illinois.

"DATED this seventh day of September, A. D. 1911.

DANIEL K. PEARSONS (Seal)"

The village accepted the deed on the day of its execution and delivery and caused it to be recorded in the office of the recorder of deeds of DuPage county. The minutes of the meeting of the village board on the same day recite: "The terms under which the property is deeded to the village, are a gift of the entire five acres to be used for library purposes in the following manner. The building and all the ground except a lot in the Southeast corner, 198 feet on Maple Street and 165 feet on Grand Street can be sold, the proceeds to be used for the erection and maintenance of a suitable building for library purposes. The lot that is exempt from the power to sell is to be perpetually used for the purpose outlined in the trust gift, and in case it is

not so used it is to revert to the Chicago Missionary Society of the City of Chicago." At this meeting the president appointed a committee of three persons, namely, a trustee and two members of the library board, to determine the best means of disposing of the property conveyed to the village by Dr. Pearsons and to fix the prices, subject to the approval of the board, and to manage, lease and control the property pending its sale. The committee entered upon the performance of its duties and made reports from time to time. October 2, 1911, the library board authorized the trustee member of the committee to obtain the books which had been donated by Pearsons to the village library. At a regular meeting of the library board in November, 1911, it was ordered that the picture of Pearsons donated to the library be placed in the village club-room for safekeeping until completion of the library. January 8, 1912, the library board authorized its president to attend to the refurbishing of the paintings given to the library by Pearsons.

April 27, 1912, Pearsons died intestate, leaving four nephews, Helene Pearsons, the wife of a deceased nephew, one niece, and two grand-nephews, as his only heirs-at-law.

As early as June 3, 1912, an offer of $6500 for the property was received and the library board recommended its acceptance by the village trustees. This offer was, however, rejected. The records of the village board disclose that the control and disposition of the property given to the village for library purposes by Dr. Pearsons was frequently considered and, further, that the trustees were aided by advice given by the library directors. In 1913, upon recommendation of the library board, the trustees accepted an offer of $4750 for lot 18, together with the house and fixtures thereon. Subsequently, in 1917, lot 20 was sold for $2812. In 1920, 82.5 feet of lot 17 was sold for $2392.50. The next year the north one-half of lot 17, was sold for $2640, and in 1925 lots 21 and 22 were sold for the aggregate sum of $10,233. Lot 19 has not been sold.

The total sale price of the five lots sold from time ·to time amounted to $22,827.50.

During the interim, the library board on April 11, 1921, discussed the matter of the Pearsons library fund and decided that it was not large enough and conditions for building were not then sufficiently favorable to warrant any attempt to erect a library building. March 6, 1922, a committee consisting of the president and members of the building and grounds committee was requested to present to the library board a sketch of a building suitable to the Pearsons property. Tentative plans and a sketch made by one Barfield were presented at an estimated cost of $17,500. The estimate, when made, was considerably in excess of the sum which had been realized from the sale of the property. Subsequently, in December, 1924, suggestions were made and considered to the end of joining with the Hinsdale post of the American Legion in the erection of a building on lot 19, to be used by both the public library and the legion post. This suggestion was, in due course, rejected. The library board, in at least six meetings in 1925, considered plans for the permanent site for the library. Early in 1926, a citizens' committee was appointed to consider the question and to raise funds. This committee in April, 1926, reported to the library board that it was unwise to launch a campaign for the purchase of a new site, recommended waiting a year and inquiring into the matter of placing the library on a different site, reported that the library needed additional funds, and stated that the members of the committee would attempt to raise $3000 annually for three years, this sum to meet the added expenses.

The invested proceeds from the sale of the property in the latter part of 1926 and 1927 amounted to approximately $25,000. At this time a plan was initiated and successfully carried to completion to provide funds for the Hinsdale Memorial Building. The public library availed itself of the offer of occupying space in the new building and

shortly after its completion moved into its present quarters in 1929. Its lease in this building is subject to vacation by the library upon notice to the trustees of the village and is subject to a rental of $75 per month. The memorial building, it appears, also accommodates the village offices and official board room, the Hinsdale post of the American Legion, the American Legion Auxiliary, the Boy Scouts and the Girls Scouts organizations and the Hinsdale Nursing and Relief Association. The memorial building was financed by contributions of residents and is operated by an association selected from residents of the community. It is so designed and constructed as to permit an addition to the space leased by the public library whenever the library may require additional space for its adequate accommodation.

By their complaint, filed November 2, 1935, plaintiffs allege that since the erection of the memorial building the need for a separate library building has ceased, and that the intention of Daniel K. Pearsons to foster and assist the public library can best be consummated by devoting the income from the fund realized from the sale of the property to the maintenance of the premises now occupied by the public library in the memorial building and to the general purposes of the library until such time as use of the principal, or a part thereof, to build an addition to the present premises may be desirable. Respecting the custody and control of the fund, plaintiffs charge that under Pearsons' deed the property for which the fund was realized was given to the village for the use and benefit of the public library and that it should be held, controlled and used by the library directors of the village in the manner provided by statute with respect to gifts for the benefit of public libraries; that the village trustees should be authorized to transfer the fund to the board of library directors to be held by the latter board in trust, the income to be used for the maintenance of the property now occupied by the public

library and for general library purposes, with the right to use the principal, or a part, for building an addition to the present premises occupied by the library, if, in the opinion of the board it should become advisable to enlarge the library's present quarters. Instructions were asked concerning the disposition of the funds realized from the sale of lots 17, 18, 20, 21 and 22, the use and future disposition of lot 19, and the status of its title to this lot. Later, answering the Chicago Congregational Union's counter-claim, plaintiffs aver that the proceeds on hand are insufficient to erect and maintain a suitable library.

The Chicago Congregational Union is the present name of the Chicago City Missionary Society organized in 1892. Since its incorporation the Union has been actively engaged in promoting religious, educational and charitable activities. By its amended counter-claim, the Union sought the entry of a decree to the effect that all right, title and interest of the village of Hinsdale to the property in controversy ceased on September 7, 1916, (five years after the date of the deed of gift) or, in the alternative, on some date prior to the commencement of this action in 1935, and that the title to lot 19, and all of the funds realized from the sale of the other five lots, together with the accretions thereon, had heretofore passed or reverted to and were now vested in it. An accounting by the village was also asked.

The heirs-at-law of Daniel K. Pearsons, by their counter-claim, sought a decree that their right to the funds in the possession of the village was superior to claims by any other party; that the village holds the fund in trust for them, and that it be directed to account to them.

When the complaint was filed in 1935, the village held securities having a book value of $35,296.03, and uninvested cash amounting to $1420.33, representing the investment and reinvestment, together with accumulations of the proceeds from the sales of the property conveyed under the deed from Daniel K. Pearsons. As narrated, all of

the property so conveyed has been sold except lot 19, which, on September 7, 1911, and at all times since, has been and now is unoccupied, vacant and unimproved.

By its decree entered July 12, 1940, the court found that the deed from Pearsons created a base or determinable fee to lot 19 in the village of Hinsdale with a potential shifting use in the Chicago Congregational Union; that under the terms of the deed the Union did not acquire any right or interest whatsoever, and has no right or interest in any of the property previously described except with respect to lot 19, and that the grantor, Pearsons, did not intend to grant or convey to it any right or interest in any of the property, or its proceeds, except with respect to lot 19 which Pearsons intended to and did convey to the Union in the event that lot 19 should cease to be held and used for library purposes. The chancellor found further that the title to lot 19 had not passed to and become vested in the Union because of the fact that the village had not yet erected a library building on the lot; that the title to this lot and the right to use it as a site for a library building still remained in the village; that there had not been an unreasonable delay on its part in determining whether to utilize lot 19 as a site for a building, but that it should decide within the near future whether it would build on lot 19, or, instead, release its right and title to the lot to the Union. It was further found that the primary purpose of the grantor was to make a gift of the property described in his deed for the benefit of the Hinsdale Public Library and that the use of the lot designated as the site for the proposed library building was not an essential element of the gift; that although it was expected a building would be erected on lot 19, the grantor intended the gift of the remainder of the property to be sold and the proceeds used to establish and maintain a public library building which should bear his name, for the benefit of the Hinsdale Public Library; that the grantor

intended if lot 19 should not be used as a site for the library or if the village should desire at any time to cease holding and using the lot for this purpose, then it should pass to the Union, but that the proceeds of the remainder of the property should be utilized for library purposes for the Hinsdale Public Library in establishing and maintaining a public library. The court also found that the proceeds from the sales of the property, amounting in value, at the time of the decree, to approximately $40,000, may properly be used by the plaintiffs for library purposes other than the erection and maintenance of a public library on lot 19, in the event that the plaintiffs decide against establishing a library on the lot.

Accordingly, the decree adjudged that none of the heirs-at-law of Daniel K. Pearsons had any right, title or interest in the property or its proceeds and dismissed their counter-claim for the want of equity. The Chicago Congregational Union, it was decreed, had no right, title or interest in the proceeds of the sales of lots 17, 18, 20, 21 and 22, and its amended counter-claim, as amended, was dismissed for want of equity. The decree next ordered the village of Hinsdale, within six months from the day the decree shall become final, to decide, whether it intends to erect a public library building on lot 19 and if it decides to erect such a building to forthwith cause the requisite plans to be prepared and the building to be erected, and, that if it decides not to do so at the expiration of the six-months' period, title thereto to vest absolutely in the Union. The court retained jurisdiction for the purpose of determining, upon the expiration of the specified period, whether a decision to erect a building has been made, and if it shall then find a decision has been made jurisdiction will be retained to enter such orders as may be deemed equitable to limit the period within which the erection of the building shall be completed. Finally, the chancellor adjudged that title to the proceeds of the sales to lots 17, 18, 20, 21 and 22, is

in the village of Hinsdale, as trustee under the terms of the deed for the use and benefit of the Hinsdale Public Library, free and clear of any rights or claims of the heirs-at-law of the grantor, or of the Chicago Congregational Union, and that the proceeds may be used for the library purposes of the Hinsdale Public Library, but only under and pursuant to the orders, directions, and instructions of the court.

The decree fixed and allowed $2500 as attorneys' fees to the plaintiffs, $1250 to the Chicago Congregational Union and $1250 to the heirs-at-law of Daniel K. Pearsons, together with costs, the costs and fees to be paid by the village of Hinsdale, as trustee, out of the proceeds realized from the sale of the property.

The controlling issues presented for decision are: (1) Do the delay of the village in constructing or obtaining library quarters, and its failure to use lot 19 for library purposes constitute a failure to accept, or a breach of the condition of the trust; (2) under the circumstances now existing may the trust funds be devoted to library quarters upon land other than lot 19, and (3) may lot 19 be used otherwise than as a site for a public library building.

A gift for the erection, maintenance or endowment of a public library falls within the definition of a charity, or a charitable use. (*Franklin* v. *Hastings,* 253 Ill. 46; *Mason* v. *Bloomington Library Ass'n,* 237 id. 442; *Crerar* v. *Williams,* 145 id. 625.) Charitable gifts are viewed with peculiar favor by the courts, and every presumption consistent with the language contained in the instruments of gift will be employed in order to sustain them. (*Peek* v. *Woman's Home Missionary Society,* 304 Ill. 427; *Skinner* v. *Northern Trust Co.* 288 id. 229.) The efforts of a trustee to comply with the conditions attached to a charitable conveyance will be regarded in the light most favorable to the trust, and for the purpose of determining the reasonableness, prudence and diligence of his action or

forebearance, all evidence bearing upon the question should be admitted and considered. (*Peek* v. *Woman's Home Missionary Society, supra; Green* v. *Old People's Home,* 269 Ill. 134.) The resolution of a village board of trustees is its official action in compliance with a requirement of acceptance of a trust. (*Newton* v. *Village of Glen Ellyn,* 374 Ill. 50.) While a resolution may not in itself be sufficient without other action under the trust during a period of years, (*Siebold* v. *City of Naperville,* 19 Fed. Supp. 281,) the sale of trust property or investment of the funds for the purpose of accumulating them toward the construction of a building, will fulfill the requirements for acceptance. (*Adams* v. *Page,* 76 N. H. 96, 79 Atl. 837.) A long delay in the complete performance of the terms of the trust is not, in itself, ground for the interference of a court of equity, especially since the trustee may, by judicious management of the fund, enhance its value. (*Gilman* v. *Hamilton,* 16 Ill. 225.) When the original capital is insufficient to effectuate the purposes of the trust in the manner directed by the donor, a lapse of time to accumulate the required funds will be deemed necessary. *Adams* v. *Page, supra.*

From the stipulated facts it is evident that the village of Hinsdale, as trustee, after formally accepting the trust, diligently increased the fund in its possession, both by seeking and obtaining the highest possible price for each lot, and by prudently investing the money on hand. Until 1926, the fund was inadequate for the construction of a library building, and it had been decided, after due consideration, that building conditions were not favorable. No facts have been presented, from which it may be concluded that, subsequently, the cost of construction would have permitted or rendered advisable the erection of a separate library structure on lot 19. Efforts to co-operate with another organization in building on this lot were made as early as 1924 and 1925, but failed because a violation

of the trust was seen as a possibility in such action. Subsequent negotiations resulted in obtaining adequate space, which may, at any time, be enlarged to meet requirements for expansion of the library. Tested in the light of the principles set forth, the foregoing circumstances establish that the delay of the village in constructing a library building was justified by the inadequacy of the trust fund, and that the leasing of space in the memorial building, the permissibility of which will hereafter be considered, was not contrary to the best interests of the trust.

Courts of equity possess original and inherent power to recognize, execute and control trusts and trust funds. (*Board of Education* v. *City of Rockford,* 372 Ill. 442; *Maguire* v. *City of Macomb,* 293 id. 441.) Equity will consider the general charitable purpose of the donor as the substance of the gift, and the mode pointed out in the conveyance for effectuating that purpose, as a mere incident of the gift. (*Crerar* v. *Williams, supra; Heuser* v. *Harris,* 42 Ill. 425.) Where a literal execution of the charity becomes inexpedient or impracticable, and the settlor has manifested a general intention to devote the property to charitable purposes, the trust will not be permitted to fail, but the court will execute it *cy pres.* (*Mason* v. *Bloomington Library Ass'n, supra; Kemmerer* v. *Kemmerer,* 233 Ill. 327; 2 Bogert on Trusts and Trustees, sec. 438.) It is not necessary that the mode prescribed be impossible of execution, but resort to the shelter of the *cy pres* rule is available if use in the designated manner is no longer feasible. (*Board of Education* v. *City of Rockford, supra.*) Courts of equity have exercised their power of administration when the funds in the trust have been found to be inadequate for the charitable purpose, (*Bruce* v. *Maxwell,* 311 Ill. 479,) when additional facilities of a similar nature have become available, and a literal execution would be wasteful, (*Mars* v. *Gibert,* 93 S. C. 455, 77 S. E. 131; *Adams* v. *Page, supra;*) or when a different mode of exe-

cution would more completely fulfill the charitable purpose of the donor. (*Gearhart* v. *Richardson,* 109 Ohio St. 418, 142 N. E. 890.) A clearly expressed desire of the donor that his property be devoted to another purpose, unless execution of the charitable use first named is feasible in the manner specified, will be recognized, but a secondary purpose will not prevail where the primary charitable objective of the donor can be attained by a different method. (*In re Young Women's Christian Ass'n,* 96 N. J. Eq. 568, 126 Atl. 610.) The fact that the donor directed a use of the funds in connection with a specific institution, or for the construction of a new building, will not prevent an application of the funds in an association different from the one named, (*Mason* v. *Bloomington Library Ass'n, supra,*) or their devotion to an existing enterprise of the same character. (*Bruce* v. *Maxwell, supra; Mars* v. *Gibert, supra.*) Likewise, when the donor directs that a building be erected upon his own land or another named site, a court of chancery does not always consider the location to be of cardinal importance. (*Gearhart* v. *Richardson, supra; Ely* v. *Attorney General,* 202 Mass. 545, 89 N. E. 166; *Weeks* v. *Hobson,* 150 id. 377, 23 N. E. 215; *Borchers* v. *Taylor,* 83 N. H. 564, 145 Atl. 666.) A requirement in the trust instrument that the charity be perpetuated as a memorial to the name of the donor or of another person named will be regarded as a part of the scheme of administration, rather than as the inducement for the gift. (*Adams* v. *Page, supra.*) When the specified name can be perpetuated, although in a different manner, by the means of execution available, an objection to the proposed change is without force. *Mason* v. *Bloomington Library Ass'n, supra; In re Young Women's Christian Ass'n, supra.*

The general charitable purpose of Daniel K. Pearsons to provide library facilities for the inhabitants of the village in which he resided is evidenced not alone by the terms

of his gift to the village, but by his previously demonstrated interest in, and contributions to, educational and charitable activities, and his participation in the library association of the village from its inception. The paramount purpose of the donor was to make available to the community the advantages of a library, and to assure the perpetuation of this charity. Obviously, the use of his own land as a site for the library building was no more than an incidental means provided for carrying out this purpose. Continued literal compliance with the direction that his land be used in this manner is not impossible, but conditions have arisen that may render inexpedient and wasteful the erection of a building for the library alone. Another building is now available, containing adequate and appropriate space for present needs and the means for future expansion, and providing an effective method of perpetuating the donor's name. The use of this building not only may result in conserving the trust funds, so that the community may be provided with a greater quantity of literary material best suited to its needs, but also may have the additional virtue of benefitting other worthy civic enterprises, which, it must be presumed, would be consistent with the evident desire of the donor. The chancellor, retaining jurisdiction in order to supervise the administration of the trust, properly directed the trustee to determine whether the present plan of execution should be continued and the use of lot 19 as a library site permanently abandoned.

The expressed wish of the grantor, as contained in the instrument of gift, and recognized by the donee at the time of acceptance, was that lot 19 should not be sold, but should be held and used as a site for a public library building. In the event this lot should ever cease to be so held and used, he directed that the title should pass to the Union. Undoubtedly, this was a secondary object, and would yield to the requirements of the paramount charitable purpose, if necessary to the latter's execution. The

trust fund, realized from the sale of the remaining lots, however, appears to be sufficient to meet all of the contemplated needs of the library, and the need for a sale of lot 19, in order to increase the accumulated sum, has not been urged. A court of equity would not be warranted in unnecessarily authorizing or directing a use of trust property in a manner contrary to the expressed desire of the grantor. It follows that the chancellor properly directed the village to determine the advisability of employing lot 19 in the manner prescribed, and decreed that in the event it shall not be retained for this purpose, the title of the village thereto shall cease.

The contention of the heirs of Daniel K. Pearsons that upon the breach of the condition contained in the instrument the estate would revert to them, and that the limitation over to the Union is invalid as an alienation of a possibility of reverter, is without foundation. There is no provision in the deed that any part of the property will revert to the heirs upon breach of condition, nor does the deed provide for a forfeiture or reentry. Consequently, the right of reentry does not exist and there is no reverter in the grantor or his heirs. (*Board of Education* v. *City of Rockford, supra; Rockford Trust Co.* v. *Moon,* 370 Ill. 250.) The distinction between a condition subsequent, creating a possibility of reverter in the grantor, and a conditional limitation, vesting a shifting or springing use in a third person, and the validity of the limitation are too well recognized to require discussion. *Harder* v. *Mathews,* 309 Ill. 548; *Green* v. *Old People's Home, supra.*

The plaintiffs have questioned the allowance of attorneys' fees amounting to $1250 to the heirs, to be paid out of the assets of the trust. It will be noted that the plaintiffs were allowed $2500 for attorneys' fees, and the Union was granted $1250 for the same purpose. The latter allowances, however, have not been challenged, and, as the question of their propriety has not been preserved,

it will not be considered. This court has aptly stated, concerning the payment of fees to heirs in a proceeding for the construction of a will: "We know of no authority in this State, and have been cited to none, which would authorize the payment of solicitors' fees to a defendant or cross-complainant whom this court finds to have no present interest under the will and therefore no interest in its construction." *Brumsey* v. *Brumsey,* 351 Ill. 414.

The decree of the circuit court is modified by striking therefrom the provision allowing attorneys' fees to the heirs in the sum of $1250. In all other respects the decree is affirmed.

*Decree modified and affirmed.*