TRUSTEES OF DARTMOUTH COLLEGE *vs.* CITY OF QUINCY, trustee, & others.[1]

Norfolk.    April 9, 1970. — May 13, 1970.

Present: WILKINS, C.J., SPALDING, CUTTER, & QUIRICO, JJ.

*Trust*, Charitable trust. *Charity.*

Discussion of *Quincy* v. *Attorney General*, 160 Mass. 431, and *Trustees of Dartmouth College* v. *Quincy*, 331 Mass. 219. [527–529]

Where it appeared in an equity proceeding that because of increased costs not paralleled by increased income there was a substantial risk of complete cessation, after more than seventy-five years of operation,

---

[1] The other respondents are the Attorney General, the Chairman of the Board of Supervisors (trustees) of the Woodward School for Girls, of Quincy, and the principal of that school.

of a school conducted in Quincy pursuant to a gift in a will to it of a
"perpetual fund," the income of which was to be used for a school for
girls, ten to twenty years old, "born" in Quincy, "none other . . .
to be allowed to attend" such school, which should be "as perfect
and as well conducted as any other in the [S]tate," that the income
from the fund had become inadequate, that Quincy born girls did not
use all the space in the school and operation at full capacity would
materially increase its tuition income, and that the school was a
community asset, it was held that a proposal to admit to the school
Quincy born girls who would be charged a tuition which would pay
part of their school costs and who alone would benefit from the trust
income, and non-Quincy born girls at a higher tuition which would
pay the full cost of their education, was a proper method, not involving
a cy pres application, of carrying out the testator's primary intent
of maintenance of a school for Quincy born girls, and that adoption
of the proposal would not make effective a provision of the will giving
the fund over to a college if Quincy should "fail to comply with . . .
this will . . . or use . . . [the fund] for any other purpose than
contemplated in this will." [531–532]

There is strong ground for deviating from subordinate provisions of a
charitable trust if changed circumstances render them obstructive of,
or inappropriate to, the accomplishment of the principal charitable
purpose. [533]

PETITION IN EQUITY filed in the Probate Court for the
county of Norfolk on February 28, 1969.

The case was heard by *Reynolds,* J.

*Ruth M. Paven* for the Chairman of the Board of Super-
visors of the Woodward School for Girls & other respondents.

*James J. Kelleher,* Assistant Attorney General, for the
Attorney General.

*John B. Dolan* for the petitioner.

*Harry Pavan,* City Solicitor, joined in a brief.

CUTTER, J. The petitioner (Dartmouth) brings this
petition in equity in the Probate Court to enjoin the city of
Quincy (as trustee of the charitable trust established under
the will of Dr. Ebenezer Woodward) and the trustees and
principal of the Woodward School from admitting to that
school "any girl who was not, either born in . . . Quincy,
or born of a parent who at the time of such child's birth,
was either domiciled in or a resident of . . . Quincy."
The final decree granted an injunction in accordance with
this prayer of the petition. There is a report of material

facts on the basis of which the facts are stated, except as otherwise indicated below. The evidence is reported. Dr. Woodward's will has been considered by this court in earlier cases. See *Quincy* v. *Attorney Gen.* 160 Mass. 431 (the 1894 case), and *Trustees of Dartmouth College* v. *Quincy*, 331 Mass. 219 (the 1954 case).[2]

The school exists because of the provisions of the fifth article (art. 5) of Dr. Woodward's will. By art. 5, he left (at his death on May 21, 1869) to Quincy all his real estate in that town, and certain other property, to found a school for girls, ten to twenty years old.[3] This school was to be "for the education of females . . . who are native born, born, I wish it to be understood, in the town of Quincy, and none other than these, to be allowed to attend this Institute which I wish to be as perfect and as well conducted as any other in the state."[4]

---

[2] The petition alleges, and it is admitted by certain respondents (and not denied by the Attorney General) that Quincy in 1965 filed a petition in the Probate Court to enlarge the class of girls allowed in the school to permit children of the trustees to attend the school. This petition was denied. No appeal was taken from that decree. We regard this decision as not presenting facts comparable to those now before us.

[3] The property bequeathed by art. 5 was "to be kept as a perpetual fund, guaranteed by . . . [Quincy] with six per cent interest forever." Paragraph 1 of art. 5 provided that the school should be established, "[w]henever the income from . . . [Dr. Woodward's] bequests shall be sufficient, in the opinion of the managers of . . . [the] fund, or at least within twenty-five . . . years after" his death.

[4] Other provisions of art. 5 include (emphasis supplied): "2. The property . . . is to be *perpetually managed* by the Selectmen . . . together with the Clerk and Treasurer of Quincy for the best advantage of said town and said Institute. 3. Whenever . . . Quincy becomes a City, then the government of said city to have the management of said property for the benefit of said city to be used according to the directions of this will and for the purposes herein mentioned. 4. I . . . recommend that the . . . city . . . should choose a committee . . . to confer with the above named officers, concerning the *best mode of managing* said property . . . . 5. The management of said . . . School so far as the selection of instructors and the studies to be pursued and all internal regulations, to be and to remain under the direction of the following gentlemen *forever* viz: — The several ordained and settled ministers of the . . . city . . . and all settled ministers to be added to the committee, from time to time, as they become residents of Quincy, I mean the Catholic as well as the Protestants and all who are settled for one or more years and reside in the town of Quincy. I wish no sectarianism taught . . . leaving that to parents and the pastors of their choice. The senior pastor of Stone Temple is to be perpetual chairman . . . . 6. I wish all the . . . branches of learning taught in this . . . school, which are taught in any other similar Institute in the State. 7. The . . . Institute is to be located on land given by . . . donor to . . . Quincy. My present opinion is that the most proper location . . . [is at a designated place on a particular farm to which he

By the sixth article (art. 6), Dr. Woodward provided, "If . . . Quincy refuses to accept the above property upon the terms herein specified, or [shall] *fail to comply with the words and intent of this will, as determined by good judges,* or should surrender the property *or use it for any other purpose than contemplated in this will,* then I bequeath the said property to the Trustees of Dartmouth College to be used by them, in the manner they may think best, *for the promotion of science and literature*" (emphasis supplied).[5]

The history of the school was stated in the 1954 case (331 Mass. 219, 222–224). Quincy (p. 222) accepted the trust and in 1870 received the property left to it by Dr. Woodward. Mrs. Woodward died in 1870, a year after her husband, and devised substantial property to Quincy "upon the same trusts and for the same purposes as are set forth in the will of my late husband . . . touching the foundation and maintenance of a Female Institution in . . . Quincy." The property (p. 223) "received from Mrs. Woodward's estate was added to that received from her husband and the whole managed, invested, and reinvested as one fund." In 1894, construction of the school's first building was completed and paid for from the accumulated income of the Woodward bequests.

Certain facts appear from the reported evidence which are not reflected adequately in the report of material facts. These do not appear to be disputed in any substantial respect.

refers] but the said committee, with the Selectmen, Town Clerk and Treasurer, are to decide on what part of said farm the location shall be." Then follow provisions dealing with a particular farm, imposing temporary restrictions upon its use, and a gift of a portion of it. In par. 10, some of these restrictions (not here material) in explicit terms were imposed "under penalty of losing or forfeiting this donation." In the provision nominating executors, Dr. Woodward provided, "My executors are simply to convey to . . . Quincy the real estate willed by me after the requirements and conditions of my will are complied with, the remainder of the property to remain in the possession and in the hands of my wife . . . with Frederic Hudson for her adviser."

[5] The seventh article expresses the wish that "the real estate held in trust by me for my wife . . . be given by her to . . . Quincy for the same purposes as this will directs, provided . . . Quincy accepts of my donation and not otherwise. This my wife can do by confirming this will or by making one of her own . . . ." The ninth article made Quincy Woodward's residuary legatee (for the benefit of the school) in certain events which did not occur.

The income from the funds left by Dr. and Mrs. Woodward (the Woodward Fund) alone, once sufficient to cover the operating costs of the school (see the 1954 case, 331 Mass. 219, 223), in 1968 provided only $13,266.85 (including building rentals) of the school's total $53,000 operating costs. Although the school has a capacity of 100 students, only sixty-eight to seventy-five girls had been in attendance for the two years next before the Probate Court hearing on May 20, 1969. Financial difficulties had adversely affected the school's accreditation. Tuition income, however, could be increased materially if the school were able to operate at capacity, and accreditation could probably be restored. It had been lost largely because of uncertainty concerning the school's financial future.

Faced with the necessity of additional income "because of increased costs," the trustees formulated a proposal to "let non-Quincy born girls attend only to fill unused space, space not being used by Quincy born girls." The purpose was that they should "be paying full tuition for the cost of their education." All the "Woodward [Fund] money would be used only for girls who qualify as . . . eligible under the . . . [Dr.] Woodward will." Tuition income from the additional non-Quincy born girls would be used to supplement income from the Woodward Fund, income from rental of the school building, tuition from Quincy born girls, and income from funds totally unconcerned with the Woodward Fund (including scholarship funds to be made available by the city pursuant to St. 1968, c. 515; see 1968 House Doc. No. 1175; 1968 House Journal pp. 2268–2269; 1968 Senate Journal p. 1570–1571). The trustees are "talking in terms of [having in the school] seventy-five Quincy born girls and twenty-five non-Quincy born girls."

On December 11, 1968, the board of managers and trustees of the Woodward School approved a proposal [6] that "the

_____

[6] The resolution explained the purpose of the action as follows: "The same way that Woodward School now rents its auditorium for non-school uses, it would rent its educational facilities to the use of non-Quincy-born girls. This is based on the premise that the present plant and faculty could absorb a

Woodward School, beginning in September, 1969, admit two different classes of students: (a) Quincy-born girls whose tuition pays part of their costs and who benefit from the [t]rust [established by the Woodward will]; and (b) otherwise qualified girls, not born in Quincy, who will pay the full cost of their education." On January 9, 1969, the Board of Managers voted that tuition figures for 1969 "be set at $600 for Quincy-born girls, and $800 for non-Quincy-born girls." This cost differential was based on the city treasurer's report that "the Woodward Fund contribution toward each student in the . . . [then current] year amounted to $181.41" and that "a depreciation figure of $11.11 per student per year" was appropriate for the use of the school property.[7] The tuition differential would permit the income from the Woodward Fund to be "exhausted entirely for Quincy born girls." The proposal thus would seem to be to the advantage of Quincy-born girls "because it would help to continue the school and increase the income [from] which they would benefit," without in any degree depleting the income or assets of the Woodward Fund.

The evidence shows that representatives of the school "go out to the Sixth Grade in Quincy each year and propose or advise and explain to them the advantages of the smaller school such as Woodward." About 700 Quincy girls would meet the age and birth requirements set up by Dr. Woodward's will. The school, however, has entrance examinations. The evidence does not indicate (a) how many Quincy-born girls would be likely to pass them, (b) how

---

greater number of pupils, without diminishing the quality of the educational services being offered. Only space unused by Quincy-born girls would be made available. Open enrollment with its potential increase in the total number of students, and with more economical operation at full capacity, will make it possible to continue to carry out the wishes of the testator." One witness agreed that the proposed method of "upgrading the school" would be likely to result in a "Quincy Girls Latin School comparable to the Boston Latin School."

[7] The minutes of the meeting of January 9, 1969, recite: "The amount applicable to the use of the building and grounds was discussed; no maintenance costs are presently borne by the [Woodward] Fund." The average expenditure from the Woodward Fund and depreciation charge, per student, presumably, would be lower for 100 students than for sixty-seven to seventy-five students.

many girls express an interest in attending the school by taking the examination, or (c) whether the school could be filled to capacity with Quincy-born girls by lowering the admissions standards. Such lower standards would seem in some degree to run counter to Dr. Woodward's purpose that the school "be as perfect and as well conducted as any other in the [S]tate."

The respondents, including the Attorney General, seek a broad interpretation of Dr. Woodward's disposition, so that the Woodward School can continue to provide education for Quincy-born girls, even though the proposal involves admitting non-Quincy-born girls. Dartmouth relies on the provisions of art. 6 of the will, quoted above, as precluding the proposal for the admission of non-Quincy-born girls, and contends that the gift over to Dartmouth must take effect if Quincy "fail[s] to comply with the words and intent of this will . . . or should . . . use . . . [the property] for any other purpose than contemplated in this will."

1. In the 1894 case, 160 Mass. 431, Quincy as trustee sought instructions on various questions. Dartmouth was named as a defendant and set up a claim to the trust estate on the ground that Quincy had forfeited the estate because it had not guaranteed the fund (pp. 433–434) as provided in art. 5 (see fn. 3, *supra*). This court (Holmes, J.) construed (p. 434) the word "guaranteed" as purporting to create "a condition subsequent," and as not expressing "the object of the gift . . . but merely a means of securing the fund," in short "merely an administrative detail." The court concluded (pp. 435–436) that compliance with this detail, unlike certain matters mentioned in par. 10 of art. 5 (see fn. 4, *supra*), was not one to which Dr. Woodward had expressly attached the penalty of forfeiture for noncompliance. This circumstance, the opinion said, "goes far to show that forfeiture was not the sanction of every detail which . . . [Dr. Woodward's] careful forethought suggested." The court pointed out (p. 437) that it did "not appear that any conflicting claims . . . [were then] made, or are likely to be made, in respect of" certain other matters

as to which four instructions [8] were then sought or that instructions concerning them were then necessary. The court said (p. 437) of these four requested instructions, "The language of the will is clear, and the trustee asks whether of its own motion it is at liberty to disregard that language." We construe this casual remark as amounting to no more than a quick disposition of requests as to which no instructions were then necessary.

Some language of the 1894 decision, however, seems of importance in the present case as defining Dr. Woodward's "dominant intent." In discussing the provisions of the possible gift over to Dartmouth, it was said (p. 436) "[I]t is questionable . . . whether the words 'as determined by good judges' do not mean that there must be a failure to comply with the intention expressed . . . after the intention has been declared judicially before the shifting clause comes into operation. At least it is plain from the whole will that *the great thing in the testator's mind, his dominant intent,* was to establish the female institute, and the general intent gathered from all the words must prevail over *any small detail* which interferes with it unless clearly he makes *exact* compliance essential" (emphasis supplied). This court thus has recognized that the failure of, or difficulty of, carrying out subordinate features of Dr. Woodward's scheme for the "female institute" need not put "the shifting clause . . . into operation."

The 1954 case, 331 Mass. 219, dealt primarily with whether Quincy could invade the principal of the Woodward Fund to meet recurring operating deficits. This court concluded (p. 227) that Quincy "was not empowered by the will or by order of court to use any part of the fund for

---

[8] These requests for instructions asked whether restricting the use of the school to girls born in Quincy was a valid restriction, whether it would prevent attendance by other girls resident in Quincy but not born there, whether Quincy-born girls not resident there could attend, and whether incidental use of the school by other girls, or attendance by girls not resident in Quincy, upon payment of tuition, would be proper. It did not appear that there was any financial need for use of the school by other girls to maintain it, or that those not born in Quincy who attended would pay all their charges and receive no support from the Woodward Fund.

current expenses" and that Quincy owed "to the fund the amount of the [past] withdrawals [from principal to meet operating deficits] with interest." The actual decision appears to have slight relevance to the issues now before us.

2. We assume that Dr. Woodward's will prevents depletion of the Woodward Fund itself for the education of girls not born in Quincy. The present proposal is not designed to permit such a depletion of the fund. Each non-Quincy-born girl would pay (a) a tuition differential (above the tuition charged to Quincy-born girls) at least equal to or in excess of (b) the average amount expended from the Woodward Fund for each student in 1968, plus an amount designed to be more than the estimated, average, annual depreciation charge (see fn. 7, *supra*, and part 5 of this opinion, *infra*) for each student. Two questions thus arise: (1) Does the will prevent the presence of non-Quincy-born girls at the school, if they really pay their own way without support from the Woodward Fund? (2) Would the dominant intention of Dr. Woodward (described in the 1894 case and expressed in arts. 5 and 6 of his will) be more effectively carried out by permitting non-Quincy-born girls to contribute (by adequate tuition) part of the cost of paying a teaching staff, and carrying on a school, with standards high enough to comply with the requirements of his will?

The situation before us does not call for the usual type of equitable application of a charitable gift cy pres. The gift under art. 5 has not yet failed entirely nor has it become impossible of execution strictly in accordance with that article without application of traditional cy pres principles.

3. There does arise, however, a somewhat analogous, immediate problem. Because of the increasing cost and complexity of good college preparatory education (and probably, also, because of the effect of monetary inflation), there is substantial risk of complete failure of the primary charitable gift, if carried out in all its details precisely as Dr. Woodward planned 101 years ago. It is difficult to see

how a school of the superior quality desired by Dr. Woodward can now long be maintained if supported only by (a) the seriously insufficient income of the Woodward Fund, (b) tuition payments of Quincy-born girls, and (c) probable contributions from other charitable or public funds.. Particularly is this so because the 1954 case (331 Mass. 219, 227) prevents use of principal of the Woodward Fund to meet current deficits.

Dartmouth contends (a) that this court has no power to approve variations in Dr. Woodward's precise plan or to modify his express language, and (b) that if the school can no longer operate without admitting girls not born in Quincy, then the alternate charitable gift to Dartmouth must immediately come into operation. It relies on a rigid interpretation of the will and certain statements of the principles of cy pres application to support this contention. See Restatement 2d: Trusts, § 399, esp. comment i; § 401, comments b to f, inclusive. See Scott, Trusts (3d ed.) § 399.2.

The statements, just referred to, do not seem precisely applicable to a situation where a valid charitable trust and enterprise, carrying out the testator's dominant charitable purpose, has been in actual operation for over seventy-five years before changed circumstances have made desirable or necessary the abandonment of certain details of the original plan. If Dr. Woodward's dominant intention "to establish the female institute" (160 Mass. 431, 436) for the benefit of Quincy-born girls is to be realized in the future, more income is necessary — or the funds may be diverted to a charitable purpose (art. 6) which (although in every respect commendable) in Dr. Woodward's mind appears to have been secondary. In the last three quarters of a century, the Quincy community has become involved in the charitable enterprise. Had the community not given the school public support by scholarship assistance and by the application of other trust funds, Dr. Woodward's benefaction probably long since would have proved inadequate for its maintenance. In any event, the school has obviously become a community asset which has been employed, in the

public interest, in a manner consistent with Dr. Woodward's central purpose.

The 1894 case (160 Mass. 431, 436) treated the administrative details of Dr. Woodward's plan (as to which any decision was then made) as not imposing such conditions subsequent as would lead to a forfeiture of the gift for the girl's school and a transfer of the Woodward Fund to Dartmouth. There still is strong reason for avoiding, by sensible interpretation or construction of trust instruments and otherwise, any forfeiture of the primary charitable trust. See Restatement 2d: Trusts, Appendix, § 401, comment e, p. 648, and cases cited. This has been the effect of certain of our decisions. See e. g. *Miller* v. *Parish of the Epiphany,* 302 Mass. 323, 326–328; *Union Congregational Soc. of Weymouth* v. *South Shore Natl. Bank,* 342 Mass. 41, 44–45, recognizing the general power of courts of equity in the administration of charitable trusts to permit deviations short of cy pres applications. See also *Ford* v. *Rockland Trust Co.* 331 Mass. 25, 28; Restatement 2d: Trusts, §§ 381, 399, comment p; Scott, Trusts (3d ed.) §§ 381, 399.4, at pp. 3119–3126; Fisch, Cy Pres Doctrine in the United States, §§ 1.01, 2.03 (b), 6.04. It is not wholly clear in all instances whether a particular decision involves (a) only construction of a charitable trust or a reasonable deviation, in the public interest, from its subordinate provisions, or (b) a traditional cy pres application, as in *Rogers* v. *Attorney Gen.* 347 Mass. 126, 132–133.

We think that the present case is one where the means and detailed methods stated by the testator "must have been subordinate in his mind to the [predominant charitable] end which he had in view." See the *Ford* case, *supra,* at p. 28. The primary charitable objective of providing in Quincy, for girls born there, a good preparatory school education cannot conceivably be harmed by using the same school facilities for other girls whose full tuition payments will make possible continued achievement of that primary objective. We regard the language of art. 5 stating that the school was to be "for the education of females . . .

who are native born, born, I wish it to be understood, in
. . . Quincy" as having reference only to the use of Dr.
Woodward's own gift. Doubtless in 1869, he expected that
his fund would suffice to maintain the school by the time it
was established (see fn. 3, *supra*) and that there would
always be a sufficient number of qualified Quincy-born
girls completely to fill the school. He could not foresee
the changes in preparatory education costs and in the habits
of our population (now much more mobile and migratory
than it was) which have taken place in the last 101 years.
Nothing in his will indicates that he would object to non-
Quincy-born girls attending, wholly at their own expense,
the school founded by him, if that should turn out to be an
appropriate or necessary method of providing the good
schooling which he desired for the specified objects of his
charitable bounty. We think that the proposal now before
us is (subject to the comments in part 5 of this opinion) a
proper method of carrying out Dr. Woodward's primary
charitable trust without violating any of its basic charitable
purposes.

Various considerations support this conclusion. The
general reluctance of a court of equity to enforce a for-
feiture of a charitable trust supports our understanding of
the Woodward School gift (art. 5). This court in the 1894
case, 160 Mass. 431, 435–436, exhibited such a reluctance
to find occasion for forfeiture at a time when the school
was just in process of formation. That reluctance is even
greater after seventy-five years of operation of the enter-
prise which Dr. Woodward's generosity brought into
existence. See *Attorney Gen.* v. *Lowell*, 246 Mass. 312,
322–323. Other authorities seem consistent with our view.
See *In re Jones* [1948] 1. Ch. 67, 70–74; Restatement 2d:
Trusts, § 401, comments e, f, and g; Scott, Trusts (3d ed.)
§ 401.4; Simes & Smith, Future Interests (2d ed.) § 257;
Bogert, Trusts and Trustees (2d ed.) § 420. See also
*Faust* v. *Little Rock School Dist.* 224 Ark. 761, 765–767;
*Attorney Gen.* v. *Frackelton*, 263 Ill. App. 250, 267–274;
*State Bank & Trust Co.* v. *Madison County*, 275 Ky. 501,

503–505; *Patterson's Estate*, 333 Pa. 92, 96; Am. Law of Property, § 24.40; Gray, Rule against Perpetuities (4th ed.) §§ 600–603.9.

4. The justification for allowing a charitable gift to continue indefinitely, without regard to the Rule against Perpetuities or related rules, is the public benefit from achievement of important charitable objectives. The same justification does not necessarily apply to subordinate details of such a charitable gift, particularly those which tend unduly to restrict adapting use of the gift to changing conditions. In some cases, indeed, subordinate provisions, originally may have been imposed, not to facilitate the achievement of a general charitable purpose, but for the personal gratification of the donor in respects wholly irrelevant to any effective execution of a public purpose. There is strong ground for disregarding such subordinate details if changed circumstances render them obstructive of, or inappropriate to, the accomplishment of the principal charitable purpose.[9] See DiClerico, Cy Pres: A Proposal for Change, 47 B. U. L. Rev. 153, 192–195, where it is suggested, we think correctly, that (a) noncompliance with detailed provisions of a charitable trust should not give rise to a transfer to an alternative trust, if such provisions are not of controlling importance in relation to the general framework of the testator's scheme, and (b) a "gift over . . . [should] be resorted to only when it appears to the court that more benefit to the community would be derived from the alternative disposition and that nobody would be substantially damaged by terminating the original trust" (p. 194).

A donor who brings into existence a charitable institution must recognize that most institutions are likely to change

---

[9] As Professor Scott points out, "Some vain and obstinate donors . . . might prefer to have their own way forever, whether that way should ultimately prove beneficial or not. But why should effect be given to such an unreasonable desire?" See Scott, Trusts (3d ed.) § 399.4, p. 3124. Although this statement was made in the course of discussing the occasion for a traditional cy pres application, it has even more logical application to a situation where changes in only subordinate features of a charitable scheme are necessary to assure its continuance.

with time, that they will become sterile if they remain static, and that they must be adaptable to new public considerations and unpredictable economic circumstances. For this reason, the intention to make mandatory even detailed restrictions on the conduct of such institutions is not lightly to be inferred. If it appears that the unduly restrictive effect was in fact intended, provisions no longer appropriate must be tested against the requirements of current public policy concerning the donor's fundamental charitable objectives.

5. The proposal (see fn. 6, *supra*, and related text of this opinion) apparently contemplated that the differential between (a) the tuition charged to Quincy-born girls and (b) that charged to other girls will be sufficient (see fn. 7, *supra*, and related text of this opinion) in effect to confine the benefits from the Woodward Fund to Quincy-born girls. Dartmouth argues that under the present proposal "the school buildings . . . are to be used for girls" not born in Quincy and that the buildings "were built with the Woodward gift and are part of the present fund." No detailed argument is made that the proposed differential in tuition charges is not adequate. This is a matter in the first instance at least, for the reasonable determination of the Board of Managers. If any issue is raised about the adequacy of the differential, it should be presented in the Probate Court upon an adequate record.

6. The final decree is reversed. The case is remanded to the Probate Court for further proceedings consistent with this opinion.

*So ordered.*