FIRST CHURCH IN SOMERVILLE (UNITARIAN) & another *vs.*
ATTORNEY GENERAL & others.

Suffolk. November 9, 1977. — May 25, 1978.

Present: HENNESSEY, C.J., BRAUCHER, LIACOS, & ABRAMS, JJ.

*Trust,* Charitable trust. *Charity. Devise and Legacy,* Charitable trust.

Under a will which established a restrictive trust for the benefit of the
First Congregational Society of Somerville and provided that if the
Society declined to accept the trust or "at any subsequent time in the
future . . . change[d] its religious tenets and cease[d] to inculcate a
Liberal Religion," then the trust should be paid over equally to Har-
vard University and the Massachusetts General Hospital, there was no
general intent to benefit religion which would authorize the applica-
tion of the doctrine of cy pres on dissolution of the Society, and such
dissolution effectuated the gift over contemplated by the testator.
[333-338]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on April 20, 1976.

The case was heard by *Wilkins,* J.

*William B. Duffy, Jr.,* for the Unitarian Universalist
Association.

*Mary Joann Reedy,* Assistant Attorney General, for the
Attorney General.

*Francis L. Coolidge* for Massachusetts General Hospital
& another.

HENNESSEY, C.J.   This proceeding is in the nature of a
complaint for instructions and, if necessary, for application
of the doctrine of cy pres concerning the Tyler Fund, a char-
itable trust established in 1881 under the will of Columbus
Tyler. It was brought by the First Church in Somerville
(Unitarian) — hereafter First Church — and the Unitarian
Universalist Association (Association). The plaintiffs named
as defendants the Attorney General of the Commonwealth,
the Massachusetts General Hospital (MGH), the President

and Fellows of Harvard College (Harvard), and the Boston Safe Deposit and Trust Company, successor trustee under Tyler's will. The case was heard by a single justice of this court on the pleadings and on a statement of agreed facts. The single justice concluded that the dissolution of the First Church in 1975 was an occurrence that prompted a gift over to MGH and Harvard equally, in trust for charitable purposes specified in the will.[1] We affirm that judgment.

Only the Association and the Attorney General have appealed. The Attorney General's position is that judgment should have been entered for the Association by the single justice. In a previous case, the real estate of the dissolved corporation and seven restricted funds held by it had been transferred to the Association by order of a single justice of the Supreme Judicial Court. The Association now prays that the Tyler Fund similarly be transferred to it, the income to be paid to the First Universalist Church of Somerville so long as it continues to offer Unitarian Universalist services, then to the Association itself. The Association argues that this may be accomplished either by recognizing the Association as a "successor" or "assign" of the First Church, within the meaning of the will and then permitting deviation from the testator's stated intent, or else by applying the fund cy pres.

As will be seen *infra*, we conclude that the details of Tyler's will can no longer be carried out, but that this is not an appropriate case for deviation or cy pres. Construing the gift-over provision liberally to prevent the charitable trust from failing and the fund from passing by intestate succession, we conclude that the dissolution of the First Church prompted a gift over to MGH and Harvard.

Columbus Tyler died testate in 1881. A founding member of the First Congregational Society of Somerville, Massa-

---

[1] First Church in Somerville (Unitarian) is the same corporation referred to by Tyler in his will as the First Congregational Unitarian Society of Somerville. The corporation retains its existence for purposes of this suit. G. L. c. 156B, § 102, as amended by St. 1965, c. 685, § 44. G. L. c. 180, § 10A, as amended by St. 1973, c. 658, § 3.

chusetts (Society), Tyler devised his home, subject to certain life interests to the Society, and he also left the residue of his estate in trust to the "Society its successors and assigns forever."

Article Sixteenth of the will detailed the purposes of the residuary trust. Tyler directed that the trust be used; (a) to encourage attendance at Sabbath School by providing an annual deposit into a savings bank for each boy or girl who regularly attended Sabbath sessions; (b) to establish a "Flower Mission" which might spend up to $250 a year to distribute flowers to the sick and to decorate the church; (c) to apply a maximum of $100 annually to discharge the debts of the Society or to repair the church buildings; and (d) to apply such remainder of income, after the above expenditures, as is necessary "to lessen the taxes upon the Pews of those persons who cannot afford to pay them."

No part of the principal was to be spent. Moreover, should there be an "accumulation of income greater than the expenditure by [the] will required," then Article Sixteenth provides for the payment of such excess equally to Harvard "for the benefit of indigent students in the Theological department of that Institution," and to MGH as "a part of the Appleton Fund."

Tyler also provided in Article Sixteenth that "[i]f the . . . [Society] decline[s] to accept this trust with the obligations imposed, or if at any subsequent time in the future shall change its religious tenets and cease to inculcate a Liberal Religion then I declare these bequests annulled in [sic] inoperative and this estate hereby bequeathed with its accumulations both real and personal shall accrue" equally to Harvard and MGH, for the purposes quoted above.

The Attorney General argues that Tyler could not have meant his gift to the Society to fail on dissolution of the corporation and transfer of its assets to the Association, because he devised his residuary estate to the "Society its successors and assigns forever." The language of the will, however, indicates that Tyler used the phrase in question as a term of

art in creating a continuing fiduciary relationship.[2] The
phrase in question reflects an acceptable manner of convey-
ing a fee to a corporation. See 3 American Law of Property
§ 12.76, at 344 (A.J. Casner ed. 1952). In such transactions,
it is customary, although not necessary, to use words of suc-
cession, paralleling the use of words of inheritance in pri-
vate deeds. *Id.* Moreover, a law stating that technical terms
such as "assigns" are not necessary to convey an estate in fee
simple was not enacted in Massachusetts until 1912. G. L.
c. 183, § 13, inserted by St. 1912, c. 502, § 19. We do not
find the quoted phrase to be probative of Tyler's intent con-
cerning disposition of the trust property on dissolution of the
First Church.

We also find no merit in the Attorney General's argument
that this court should permit deviation from Tyler's specific
mandates, which are now incapable of fulfilment. This is
not a case where the trustee could continue to carry out the
settlor's stated intent if permitted to deviate from adminis-
trative provisions of the gift which have become burden-
some or impossible to carry out. See *Trustees of Dartmouth
College* v. *Quincy* 357 Mass. 521, 533 (1970). See also
*Millikin* v. *Littleton*, 361 Mass. 576, 581 n.7 (1972). The
limited purposes for which the Society, while in existence,
was obliged to use the trust income indicate that the restric-
tions imposed by Tyler were not merely subordinate details.
See *Trustees of Dartmouth College* v. *Quincy, supra.*
Rather, these limitations — together with the provision that
excess income should go to Harvard and MGH equally —
indicate that the restrictions were of controlling importance
in the testator's over-all plan. See *id.*

The Association and the Attorney General further argue
that this is a proper case for modification of the trust under
the doctrine of cy pres. It is not enough, however, that, due
to changed circumstances, it has become impracticable to

---

[2] The pertinent sentence reads as follows: "All the rest, residue, and re-
mainder of my estate real and personal I give devise and bequeath to said
Society to have and to hold the same to said Society its successors and
assigns forever, but for the purposes following."

administer the trust in the precise manner provided by the testator. E.g., *Teele* v. *Bishop of Derry*, 168 Mass. 341, 343 (1897). Despite impracticability, cy pres will not apply if there is a lack of general charitable intent on the testator's part. *Id.* See *Wesley United Methodist Church* v. *Harvard College*, 366 Mass. 247, 250 (1974). In order to determine the character of the testator's charitable intent, we look to the language of the will as a whole, and also to the circumstances relevant to the property involved in the testamentary trust. *Rogers* v. *Attorney Gen.*, 347 Mass. 126, 132 (1964).

Tyler was a founding member of the Society. Throughout thirty-five or so years of his life, Tyler devoted himself to strengthening the congregation he had helped to establish by serving as an officer of the Society, as chairman of the "Standing Committee," and as a member of various temporary committees. When the church building was destroyed by fire in 1852 and had to be rebuilt, Tyler was instrumental in seeing that the Society's debts were paid. Tyler clearly knew of the existence of the Association's predecessor, the American Unitarian Association, a loose confederation of discrete Unitarian churches; he was a delegate at the 1874 convention of the organization, representing the independent views of the Society.

The conditional gift over to Harvard was consistent with Tyler's religious beliefs, since the Harvard Divinity School was a center of Unitarian learning throughout the mid-Nineteenth Century, all its professors being Unitarian until 1880. *Trustees of Andover Theological Seminary* v. *Visitors of the Theological Inst. in Phillips Academy*, 253 Mass. 256, 289 (1925). Moreover, Tyler's ties with MGH are well documented. The Appleton Fund named in Tyler's will existed to help poor, curable patients of McLean Asylum (McLean), a part of MGH. Tyler had worked at McLean for thirty-six years, first as an attendant, later as steward; Tyler's wife was matron of the asylum. When the Tylers left the service of McLean in 1863, the board of trustees of the MGH offi-

cially recognized their efforts. N.I. Bowditch, A History of the Massachusetts General Hospital 597-598 (2d ed. 1872).

We do not find any general intent to benefit religion which would authorize us to apply the doctrine of cy pres. On the contrary, we conclude that the intent of the testator in this case was to support the particular Unitarian church which he had helped establish and, in the alternative, to support Unitarian education at Harvard and the poor of McLean Asylum, who received the benefits of MGH's Appleton Fund. The Association's reliance on similar cases in which we have reached a different result is misplaced. See *First Bank & Trust Co.* v. *Attorney Gen.*, 371 Mass. 796 (1977); *Union Congregational Soc'y* v. *South Shore Nat'l Bank*, 342 Mass. 41 (1961); *Reed* v. *Fogg*, 248 Mass. 336 (1924). "To attempt to formulate a general rule which would solve all such cases would be an attempt to achieve the impossible." *First Universalist Soc'y* v. *Swett*, 148 Me. 142, 150 (1952). Each case turns on the intent of the particular testator. *Id.* See *Easterbrooks* v. *Tillinghast*, 5 Gray 17 (1855).

The Association and the Attorney General argue that the conditional gift-over provision found in Article Sixteenth has not been triggered, but we give this provision a liberal construction, as we must, in order to effectuate Tyler's stated charitable intent and to prevent the Tyler Fund from failing altogether and passing by intestate succession. See, e.g., *First Bank & Trust Co.* v. *Attorney Gen.*, *supra* at 799. The will provides that if the Society "at any subsequent time in the future shall change its religious tenets and cease to inculcate a Liberal Religion," then the interest of the Society shall pass to Harvard and MGH equally, for the purposes specified in the will. The Attorney General would read this provision as anticipating only a change in religious teaching from Unitarianism to trinitarian Congregationalism, but, of the several constructions that have been argued in this case, this is the most restrictive. We read the provision in question disjunctively and conclude that Tyler's language yields a gift over either if the Society changes its religious tenets or if

it ceases to inculcate a " Liberal Religion." By dissolving, the Society has ceased to inculcate any religion, and we hold that the gift over contemplated by the testator has taken effect.

*Judgment affirmed.*