TOWN OF BROOKLINE *vs.* CHARLES B. BARNES & another, trustees, & others.

Norfolk.    January 3, 1951. — March 15, 1951.

Present: QUA, C.J., LUMMUS, WILKINS, SPALDING, & WILLIAMS, JJ.

*Charity. Trust,* Charitable trust. *Equity Jurisdiction,* Charity. *Attorney General. Equity Pleading and Practice,* Decree.

The courts are not required to adopt a particular scheme for the application of funds cy pres merely because that scheme is approved by the Attorney General; the selection of a proper scheme is a judicial function.

In applying the cy pres doctrine in the case of an unaccepted legacy to a town "as a fund or part of a fund for the purpose of establishing and maintaining a public general hospital in the town, the income from the same, until the establishment of such a hospital, to be used for the relief of sickness among the poor," this court on the facts, including practical financial considerations, adopted a scheme, proposed by the town and recommended by a master, for use of the legacy for the construction and maintenance of a modern health center under the jurisdiction of the town's health department, wherein the preventive aspect of medicine would be emphasized, rather than an alternative scheme, proposed by an existing incorporated public general hospital in the town and favored by the Attorney General, for use of the legacy for expansion of the hospital by rebuilding or enlarging it.

Upon adopting in general a certain cy pres scheme, this court authorized
the trial court, in framing a decree to put the scheme into effect, to
supply necessary detail and to provide that the case be retained for a
reasonable time for such further action as might become necessary.

PETITION in equity, filed in the Probate Court for the
county of Norfolk on February 2, 1948.

Proceedings before a master and *Reynolds*, J., following
the decision by this court reported in 324 Mass. 632 are
described in the opinion.

*L. E. Ryan*, Assistant Attorney General, (*G. J. Barry*,
Assistant Attorney General, with him,) for the Attorney
General.

*D. G. Rollins*, for the town of Brookline.

*Lee M. Friedman*, (*J. Kruger & A. J. Dimond* with him,)
for Allerton Hospital.

SPALDING, J. In the fifteenth clause of his will Stephen G.
Train (who was a resident of Brookline at the time of his
death on May 6, 1920) bequeathed the residue of his estate
"to the town of Brookline as a fund or part of a fund for
the purpose of establishing and maintaining a public general
hospital in the town, the income from the same, until the
establishment of such a hospital, to be used for the relief of
sickness among the poor." We held in 324 Mass. 632 that
the action of the town with respect to the bequest was not
an acceptance of it, but we were of opinion that the testator
had a general charitable intent and that the case was a
proper one for the application of the cy pres doctrine.
Accordingly we remanded the case to the Probate Court
"for the framing and settling of a scheme, either with or
without the aid of a master, for the application of the fund
cy pres." The judge of the Probate Court referred the case
to a master. Motions to intervene presented by the town
of Brookline (hereinafter called the town) and by the Aller-
ton Hospital (hereinafter called Allerton) were allowed.

At the hearing before the master three separate schemes
were proposed and the master dealt with each of them in his
report. One of the schemes, however, need not concern us.
It was not recommended by the master nor adopted by the

judge and it is not pressed before us. The two schemes which concern us here are one proposed by Allerton and one proposed by the town. An interlocutory decree was entered which overruled the exceptions to the master's report, confirmed the report, and adopted the scheme which was proposed by the town and recommended by the master. Being of opinion that the decree so affected the merits of the controversy that the matter ought to be determined by this court before further proceedings, the judge reported the case. G. L. (Ter. Ed.) c. 215, § 13. All questions of law arising out of the master's report, the exceptions thereto, the motions to intervene, and the interlocutory decree were reported.

We shall now summarize the findings and recommendations of the master touching the schemes proposed by Allerton and the town.

### ALLERTON'S SCHEME.

Allerton was incorporated on October 19, 1945, under G. L. (Ter. Ed.) c. 180. It conducts a hospital on Allerton Street, Brookline. The hospital consists of a three story brick building in good condition which was constructed about 1919. Near by on the same street is a three story frame building used as a nurses' home. The hospital has the usual medical equipment with operating and delivery rooms and a nursery, all properly equipped for a hospital of its size. Its X-ray equipment is complete and modern. It has beds for fifty adults and there are twenty bassinets for new born infants. By converting private into semiprivate rooms, the adult bed capacity could be enlarged to sixty. The hospital offers medical, surgical and maternity services to the community on a nonsectarian basis. It has been approved by the American College of Surgeons, and is a participating hospital of the Massachusetts Hospital Service, Inc., commonly known as Blue Cross. It is governed by a "board of thirty nonmedical trustees, fourteen of whom are residents of Brookline."

"From 1946 through 1949 this hospital has treated 9,222 adult patients and during that period 2,179 babies were

born at the hospital. Of the adult patients during this period, 41 were cared for entirely as free patients or at nominal rates. Of these 41 patients, 9 were residents of Brookline. In 1949 alone 1,938 adult patients were treated. Of these 132 were residents of Brookline, and of the entire group, 11 were on a free or part-free basis. Of the latter number, 9 were residents of Brookline."

Allerton desires to expand its existing services and facilities either by building a new hospital or by enlarging the present hospital to about one hundred ten beds, and by establishing an outpatient department, a service not now available in the town. The capital assets of Allerton as of September 30, 1949, amounted to $487,848.40. They were unencumbered and consisted of a general fund in the amount of $87,370.38, a plant valued at $265,374.97, a building fund in the amount of $134,080.02, and an endowment fund amounting to $1,023.03. In order to carry out its plans for expansion Allerton inaugurated a campaign for funds in 1947 from which it received pledges amounting to $178,-510.90, $99,312.30 of which has been paid.

Allerton's plan for a new hospital with a capacity of one hundred ten beds would call for the expenditure of $1,700,000. It would raise this money as follows: $500,000 to be realized from its capital assets, $400,000 from the Train bequest,[1] and an allotment of $800,000 from the Federal government which it hopes to obtain under the so called Hill-Burton act. U. S. C. (1946 ed.) Title 42, § 291 et seq., as amended. "There is, however, no certainty that this hospital will receive a distribution from this fund. At least three other hospital projects in the Commonwealth appear to have some priority in such a distribution but there is a probability that some allotment could be obtained from this fund. The amount and time of such an allotment is uncertain. . . . There is no evidence from which I can find that there is any reasonable probability of receiving a grant of as much as $800,000." The foregoing sums would leave

---

[1] At the time of his report the master found that the amount of the fund under the Train will was $396,000.

nothing for operation and maintenance and Allerton would have to rely on getting the money for these purposes from patients or charitable contributions.

If the alternative plan of enlarging the present hospital were adopted, the financial situation would be comparable except that the cost would be $1,100,000 instead of $1,700,-000. In either case the Train bequest and the grant under the Hill-Burton act would be needed. Under either plan Allerton would rely upon receiving from the town a substantial number of indigent patients for whom the town would pay. "There is, however, no assurance that the town will use such service and . . . such a service would be no financial benefit to such patients."

The master's conclusion with respect to Allerton's plans was as follows: "In my judgment neither of these plans offers a practical scheme for rebuilding or enlarging the Allerton Hospital. The risk of failure is too great, when the result might be a serious depletion of the Train fund. Furthermore to turn this fund over to the Allerton Hospital would seem to put it beyond the power and control of the town or even of this court. This scheme does not in my judgment sufficiently tend to aid the sick of the town especially such of them as are poor. This is in part indicated by the evidence as to the persons for whom this hospital has cared since 1946. On all the evidence I cannot and do not approve or recommend this scheme."

### THE TOWN'S SCHEME.[1]

The scheme proposed by the town contemplates the construction and maintenance of a modern health center which would be under the jurisdiction of the town's health department established pursuant to St. 1945, c. 345. The department is under the direction of an experienced doctor, as the statute provides, and he has the benefit of the advice of an advisory council. The health center would provide curative,

[1] This scheme was the result of a study undertaken by a committee of prominent citizens appointed by the town. It was unanimously approved by the selectmen of the town and was submitted by them to the master.

diagnostic, and medical facilities. So called multiphasic clinics would be established for the control of tuberculosis, diabetes, dental caries, heart disease, cancer, venereal disease, mental hygiene, and immunization of children. All of this work can be both preventive and curative. Also included in the work of the center would be "physical examinations and office type treatment for the sick poor of the town, . . . [and] a first aid surgical dressing unit for the care of local accidents." At present services of this sort are performed at the outpatient departments of public general hospitals in adjacent communities. The center would also provide diagnostic assistance to the inhabitants of the town, thereby affording to persons of insufficient means the advantages of X-rays, chemical tests, and pathological examinations which they might not otherwise have. The center would not receive or care for bed patients.

A building for the center would be needed, the cost of which would be approximately $375,000. For such a building the town owns several available sites. Under the aforementioned Hill-Burton act the town could expect a grant of approximately $142,500, and the master was satisfied that there was a well founded expectation that this grant could be obtained within about three months after it was applied for. The difference of $232,500 would come from the Train fund, leaving a balance in that fund of about $167,500 which the town would hold and invest as a separate fund. The annual income derived therefrom, approximately $5,000, would be used for the maintenance of the building. It is estimated that about $30,000 a year in addition would be needed to carry on the center and the selectmen are of opinion that this amount would be provided by the town.

### MASTER'S RECOMMENDATION.

The master recommended the scheme proposed by the town. While recognizing that the health center contemplated by the town was not a "public general hospital," he was of opinion that it was "well within the dominant purpose of the testator of 'aiding the sick of the town especially

such of them as are poor' [324 Mass. 632, 639] [and] perhaps more nearly so than the maintenance of a comparatively small public hospital. Such a health center will apply modern methods of preventive medicine and diagnosis and thus . . . will go far in preventing many residents of the town from becoming hospital cases."

### EXCEPTIONS TO REPORT.

Allerton's exceptions to the master's report have not been argued and they are treated as waived. Of the exceptions argued by the Attorney General only a few need be considered specifically. It is argued (exception 3) that the finding that Allerton's scheme would be of no financial benefit to the indigent patients sent there by the town is inconsistent with his finding that such treatment is now furnished in institutions outside the town. The Attorney General's complaint seems to be that the master's finding ignores the fact that the expense of travel to persons treated locally would be reduced. We assume that indigent persons who are treated within the town would receive the incidental financial benefit resulting from reduced travel. In his ninth exception the Attorney General argues that the master erred in failing to find that Allerton is a public general hospital. The exception is without merit. *Minot* v. *Minot*, 319 Mass. 253, 259. The remedy was by motion to recommit for further specific findings of fact. *Lowell Gas Co.* v. *Department of Public Utilities*, 324 Mass. 80, 90. The remaining exceptions argued arise out of the fact that the master recommended the scheme proposed by the town rather than that proposed by Allerton. These will be dealt with presently when we come to discuss the merits.

### THE MERITS.

The Attorney General in the court below and here has argued in favor of Allerton's scheme. Allerton contends in effect that because of such approval its scheme is "entitled to be upheld by our courts unless illegal." That is not the law. The function of the Attorney General is "simply to

present the question to a court of justice, not to control or direct its judicial action." *Jackson* v. *Phillips*, 14 Allen, 539, 580. There is nothing to the contrary in G. L. (Ter. Ed.) c. 12, § 8, which provides that the Attorney General "shall enforce the due application of funds given or appropriated to public charities within the commonwealth, and prevent breaches of trust in the administration thereof." See *Parker* v. *May*, 5 Cush. 336, 338; *Attorney General* v. *Parker*, 126 Mass. 216, 219. The application of funds cy pres is a judicial function, and this court may remand a case for the framing of such a scheme as we did here (*Brookline* v. *Barnes*, 324 Mass. 632, 639), may frame a scheme itself (*Osgood* v. *Rogers*, 186 Mass. 238, 241), may choose between various schemes reported by a master, accepting the one it deems best (*Amory* v. *Attorney General*, 179 Mass. 89, 105), or may accept the general scheme recommended by the master with such modifications as it deems necessary (*Briggs* v. *Merchants National Bank*, 323 Mass. 261).

In applying the doctrine of cy pres the courts endeavor to accomplish the general charitable purpose of the testator "as nearly as it can be conveniently done, consistently with the efficacious promotion of the general design." *American Academy of Arts & Sciences* v. *Harvard College*, 12 Gray, 582, 599. The testator's immediate purpose was the establishment of a public general hospital in Brookline. But, as we said when this case was here before, "Aiding the sick of the town, and especially such of them as are poor," appears to have been his dominant purpose. 324 Mass. 632, 639. We should not, therefore, be quick to adopt a scheme merely because it might relate to a public general hospital. It is fair to assume that the testator did not want a public general hospital under any and all circumstances. He wanted one only if the prospects of its being carried on successfully and for the benefit of the people of Brookline were propitious. If a more practical and efficacious method of effectuating the testator's dominant purpose is available it should be utilized. "Equity . . . will presume that the donor would attach so much more importance to the object

of the gift than to the mechanism by which he intended to accomplish it that he would prefer to alter the mechanism to the extent necessary to save the object." *Briggs* v. *Merchants National Bank*, 323 Mass. 261, 274–275.

It remains to consider whether the scheme proposed by the town and recommended by the master ought to be adopted. We are of opinion that it should be. That a health center is not a public general hospital is obvious. But the two have common objectives. Both seek to promote and safeguard the health of the community. The former emphasizes the preventive aspect of medicine whereas the latter stresses the curative aspect. It is a matter of common knowledge that in recent years much emphasis has been put on the preventive features of medical science with a view to reducing the incidence of disease and, by early diagnosis, to avoiding its more serious consequences. This is but an application of the old adage that "an ounce of prevention is worth a pound of cure." As the master observed, a health center "will go far in preventing many residents of the town from becoming hospital cases." Added to these considerations is the very practical one that the town's scheme has a good chance of being carried out whereas the success of Allerton's plan is far from certain. Moreover, under the latter plan it is difficult to see that much if any benefit would enure to the sick poor of the town. All things considered we are disposed to agree with the master's conclusion that the town's scheme is "well within the dominant purpose of the testator of 'aiding the sick of the town especially such of them as are poor,'" and ought to be adopted. In reaching this conclusion we are not influenced by the finding (to which Allerton and the Attorney General object) that "to turn this fund over to the Allerton Hospital would seem to put it beyond the power and control of the town or even of this court." As we said earlier, "There is nothing to show that the testator regarded it as essential that the town should be the trustee" (324 Mass. 632, 639). Probably the master meant no more

than that, other things being equal, the fund ought to remain under the control of the town, the original beneficiary named in the will. The control by the court would seem to be the same in the one case as in the other except as this might be the more difficult after the entire fund had been put into a new or enlarged hospital as contemplated by Allerton's scheme. Reading the report as a whole, we think that the master's ultimate conclusion would have been the same without this finding. But however that may be, the responsibility for putting the proper scheme into operation now devolves on this court and we do so without reliance on that finding. We have assumed in the foregoing discussion that Allerton, as the Attorney General has argued, is a public general hospital.

### The Decree.

Except to the extent hereinafter indicated we do not undertake to prescribe in detail the form of decree to be entered. Obviously in setting up the scheme here approved there will be many matters to be worked out that cannot now be anticipated and we think that the wiser course is to leave those details to the judge of the Probate Court. The master recommended that any decree should be conditioned (1) upon the acceptance of its scheme by the town by vote of its town meeting and (2) upon the obtaining of an allotment of funds under the Hill-Burton act of not less than $142,500. We adopt this recommendation but without imposing a condition that the decree is to depend on the town's receiving "not less than $142,500" of Federal funds; it will suffice if the judge is satisfied that sufficient funds are available from that source to ensure the success of the scheme. Thus the decree should not be a final one and should provide that the case be retained for such further action as may be necessary when the town has either complied with these conditions or has failed to do so within a reasonable time. See *Briggs* v. *Merchants National Bank,* 323 Mass. 261, 280. The interlocutory decree is affirmed.

*So ordered.*