LUMAN BURR, Plaintiff, *v.* JAMES R. BROOKS *et al.*, Defendants.—(JOSEPH F. BOHRER, Trustee, Plaintiff-Appellee, *v.* WILLIAM J. SCOTT, Attorney General, Defendant-Appellee; THE CITY OF BLOOMINGTON, Defendant-Appellant; MORGAN-WASHINGTON HOME, Intervening Appellee; BLOOMINGTON BOARD OF EDUCATION, School District No. 87, McLean County, Intervening Appellee and Appellant.)

Fourth District   No. 15219

Opinion filed July 30, 1979.—Modified on denial of rehearing September 24, 1979.

Dunn, Brady, Goebel, Ulbrich, Morel and Jacob, of Bloomington (Richard T. Dunn and Frank M. Brady, of counsel), for appellant.

Thomas M. Barger, III, of Livingston, Barger, Brandt, Slater and Schroeder, of Bloomington, for appellee Joseph F. Bohrer.

Ralph Turner, of Luedtke, Hartweg and Turner, of Bloomington, for appellee Morgan-Washington Home.

John C. Mulgrew, of Davis and Morgan, of Peoria, and Jay G. Swardenski and Kathleen M. McKenna, both of Seyfarth, Shaw, Fairweather and Geraldson, of New York, New York, for appellee Bloomington Board of Education.

Mr. JUSTICE GREEN delivered the opinion of the court:

This case concerns the construction of a trust created under the will of a noted Illinois jurist, John M. Scott, who died January 21, 1898. He served 10 years as a county judge, 8 years as a circuit judge, and 18 years as a supreme court justice during which period he was chief justice for three terms.

On August 12, 1977, petitioner Joseph F. Bohrer, trustee of that trust, petitioned the circuit court of McLean County for "instructions relative to the further administration" of the trust. The petition alleged that the last of the annuitants made beneficiaries of the trust had died and requested that the court construe the will to determine the disposition of the residue. Numerous parties were made defendant. Of those, William J. Scott, Attorney General, and City of Bloomington (city) are before the court on appeal. Morgan-Washington Home (Morgan-Washington), a not-for-profit corporation, and Bloomington Board of Education, School District No. 87 (School District), were subsequently permitted to intervene. After various proceedings and a hearing on the merits, the trial court entered an order on October 5, 1978, the substance of which was to award 6/7 of the residue to Morgan-Washington for erecting a suitable building and funding an endowment and 1/7 to the School District to support vocational education.

The city appealed the foregoing order and the School District and Morgan-Washington cross-appealed. The thrust of the city's appeal is that it has accepted the trust and can fulfill the primary objective of the trust within the doctrine of equitable deviation. It maintains that when the primary purpose can be thus served, a condition favoring it should prevail over a secondary purpose that would be served by intervenors, the School District and Morgan-Washington. The School District asserts that it should have received the use of a greater portion of the trust fund. Morgan-Washington has filed no brief as cross-appellant.

The School District filed a separate appeal from a subsequent trial

court order denying it attorney's fees. The Attorney General has appealed an order allowing fees to the trustee and his attorney.

The complaint contained a copy of the will which had been executed in 1890. After making various bequests and giving a life estate to testator's wife, it made provision for the previously described annuities. It then directed that upon the death of the last annuitant, all assets except two tracts of real estate were to be converted into money or interest bearing securities to be used for what the will described as a "noble charity." After converting the estate, the trustee was directed to pay the same to the city of Bloomington to be held in trust for the uses or purposes named thereafter. With the trust fund, the city was directed to erect and construct on the property on which decedent resided and an adjoining lot, a building suitable for a hospital to be called "Scott City Hospital." It was to be operated under the city's direction and control and the Elders of the Second Presbyterian Church were to be permitted to advise as to its management and the care of the patients. No more of the trust estate was to be used for construction "than the amount of said trust estate will justify in the judgment of reasonable persons" appointed by the city to have charge of this construction. Whatever trust funds or property remained were to be held in trust by the city as an endowment fund for the hospital. The hospital was to be for the use and benefit of all sick "who may not be able to pay for needed care and attention" particularly those injured by accident who have no friends to care for them. Anyone who wished to be admitted to the hospital and was able to pay for his care or treatment was to be charged "only a reasonable sum."

The next paragraph provided that should the city, by resolution, "decline to accept the trust hereby created for the erection and maintenance of said hospital," the trustee under the will was directed to procure an act of incorporation under Illinois law for establishing an "Industrial School for Girls" and for a site for such school. The trustee was then directed to convey the lots and trust funds to the corporation in trust for the erection of suitable buildings and an endowment fund for such an institution. Again the school was to be open to inspection by Elders of the Second Presbyterian Church, and they were requested to advise and oversee. The deceased stated that it was his will that only a reasonable sum be used to erect the buildings so that a greater sum remain for the endowment fund, the income of which was to support the school.

By its answer filed October 5, 1977, the city requested that the assets of the trust be distributed to it as provided in the will. Then on February 17, 1978, it filed a resolution of its city council purporting to accept the trust. The resolution stated that there were sufficient hospitals in the area and the real estate described in the will was not now suitable for such a project. It also stated that permission of other governing authorities to

build and operate another hospital could not be obtained. The resolution directed that the court be asked to order the sale of the real estate to augment the trust fund. In order to meet contemporary health care needs of the city, the resolution proposed that the trust be administered (a) using part of the income to provide health care for those unable to pay for such or who would encounter hardship in doing so, but who were not eligible for other public or private assistance, (b) using a portion of the principal to purchase or construct a family care and diagnostic center which would memorialize the name of John M. Scott and would provide free services to persons unable to pay and services at a reasonable sum to others, and (c) as an alternative or supplement to (b), establishing an emergency medical services program including training and equipment of paramedics.

Answers to the trustee's petition filed by intervenors, the School District and Morgan-Washington, on April 19, 1978, and April 24, 1978, respectively, both requested that the court find (1) it is either impossible, impractical or illegal to carry out Justice Scott's specific charitable intent, and (2) a general charitable intent was expressed which should be carried out by an application of the *cy pres* doctrine. The School District alleged that the will expressed a general charitable intent to improve industrial education and requested that the funds be placed in a trust to endow the advancement of vocational education in its schools. Morgan-Washington alleged the general charitable intent to be improving health care facilities and housing and educational training for girls in the city. To that end, it requested the court to transfer the funds in trust to be used for the housing and educational projects of Morgan-Washington Home or in the alternative to construe the will as desiring to benefit both types of charities and include Morgan-Washington.

Evidence was presented that at the time Justice Scott wrote his will there was only one hospital in Bloomington and at the time of his death another hospital had been established in Normal. There are now three hospitals in Bloomington-Normal with a combined occupancy rate of 73%. Several witnesses testified that there is no need for another hospital and indeed if one were constructed, it would not be possible to obtain a license or permit to operate it. Witnesses also testified that there are still significant numbers of indigent people in Bloomington who require medical and hospital care but are unable to pay for it and do not qualify for existing financial assistance. The city presented in evidence a resolution supplementing the one filed on February 17, 1978, and setting forth in more detail the nature of the health care facility it proposed, indicating that the center would feature a program to screen people for early indication of illness and then refer them to existing medical facilities for treatment.

Morgan-Washington Home was shown to be the successor to the Women's Industrial Home of McLean County which was incorporated on March 12, 1889, and was granted the right to avail itself of the provisions of "An Act to aid industrial schools for girls" (1879 Ill. Laws 309; now Ill. Rev. Stat. 1977, ch. 122, pars. 646 to 660). According to its amended articles of incorporation, its purposes are to maintain and operate a home for children and to provide for their education, care, training and development; to conduct and carry on social work for the guidance and welfare of children and work and activities designed to further their moral, mental, social and physical welfare and betterment. Morgan-Washington is licensed by the Illinois Department of Children and Family Services (DCFS) as a residential facility and was soon to be licensed as a child welfare agency which would permit them to recruit and license foster families. Its residents are girls from 12 to 16 years of age at time of admission who are referred from DCFS or the courts. In the last year (1977-78), it accepted a total of 58 girls, 21 from McLean County. It can house a maximum of 18 residents at one time. The majority of the residents are classified as minors in need of supervision or delinquents, with a small percentage of dependent or neglected children. The residents receive their formal education either in the local public schools or at Morgan-Washington in cooperation with District 87. At that time, none were enrolled in District 87's Area Vocational Program.

Evidence was presented that District 87 currently maintains a comprehensive and substantial program of vocational and industrial education which has expanded far beyond the typical vocational curriculum of an 1890's girls' school. Many of these courses are also offered at other area high schools.

The principal issues in this case concern application of the doctrines of *cy pres* and equitable deviation.

Restatement (Second) of Trusts §399 (1959) defines the doctrine of *cy pres* in these words:

"If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor."

This definition appeared in the original Restatement of Trusts and was cited with approval and applied in *Board of Education v. City of Rockford* (1939), 372 Ill. 442, 451, 24 N.E.2d 366, 371.

The parties do not seriously dispute that, (1) if the gift to the city was

the only charitable gift designated in the trust, the city's proposal would qualify under the *cy pres* doctrine, if not otherwise, as a permissible disposition of the trust, and (2) if the alternate gift was the only charitable gift designated in the trust, some division of the proceeds to Morgan-Washington and the School District under the plan ordered by the court would also qualify under the *cy pres* doctrine. The dispute arises because the will provides for an alternate charitable trust and literal compliance with either the primary or alternate charitable trust is not possible or practical.

■■■ The city seeks to avoid being required to argue that it was entitled to have its proposals accepted by the court under a *cy pres* theory by asserting that its proposals should have been accepted under the doctrine of "equitable deviation." As with *cy pres* this doctrine is applicable when literal compliance with the terms of the trust endowment is impractical, illegal or impossible. (Bogert, Trusts & Trustees §394, at 247 (2d ed. rev. 1977); Scott, Trusts §381, at 2983, 2987 (3d ed. 1967).) This power is distinguishable from *cy pres* in that the former is applicable to all trusts and can be applied where the settlor manifests a specific as well as a general charitable intent. (15 Am. Jur. 2d *Charities* §§157, 164 (1976).) The two doctrines are further distinguished by the statement in comment (a) to Restatement (Second) of Trusts §381 (1959) that equitable deviation concerns the administration of the trust while *cy pres* permits the application of the trust proceeds to purposes other than those provided for in the trust instrument.

■■ A general rule has developed that the *cy pres* doctrine cannot be applied where the settlor provides for an alternate use of the trust corpus if the primary purpose fails or is refused, but it is clear that "equitable deviation" is permissible even though such an alternate use has been stated. (15 Am. Jur. 2d *Charities* §160 (1976).) Thus, although we are not persuaded that the general rule is applicable to the situation here, we need not decide that issue if the city's proposals met the requirements of the "equitable deviation" doctrine.

In *Village of Hinsdale v. Chicago City Missionary Society* (1940), 375 Ill. 220, 30 N.E.2d 657, the court stated the following dictum:

"A clearly expressed desire of the donor that his property be devoted to another purpose, unless execution of the charitable use first named is feasible in the manner specified, will be recognized, but a secondary purpose will not prevail where the primary charitable objective of the donor can be attained by a different method." (375 Ill. 220, 234, 30 N.E.2d 657, 664.)

When the primary charitable objective of the donor or testator can be obtained by a method that meets the requirements of the equitable

deviation doctrine, we agree that the foregoing states the law. If the city's proposal here met those requirements, the trial court was required to accept it.

Accordingly, we must determine whether the city's proposals were within that theory. No Illinois case expressly applying the theory has been called to our attention. In *Village of Hinsdale,* several lots were conveyed to the village in trust. One was to be used for a site for a library to be named after the grantor and the proceeds from the sale of the others were to be used for its construction and maintenance. Upon failure of the lot to be used for library purposes, title of the trustee to the lot was to terminate and the property become vested in the Missionary Society, a charity. Upon failure to build a library on the site and a resolution of the village not to do so but to sell the lot and use it for maintaining a library elsewhere, the trial court ruled the lot to have become vested in the Missionary Society. The supreme court affirmed saying: (1) the city was shown not to need the proceeds of the lot for library purposes, and (2) had it needed the money, the court would have permitted the city to sell the lot and so use the proceeds. Thus, the facts of the case had all of the makings of a situation for equitable deviation. The supreme court's theory that the village might have been able to sell the lot and use the proceeds could not have been based on *cy pres* because the gift over to the Missionary Society without conditions of compliance would have made that doctrine inapplicable.

The city cites many cases from other jurisdictions in support of its theory that its proposals met the requirements for equitable deviation. However, in those cases, either (1) the *cy pres* doctrine was applied, (2) it is impossible to determine that it was not being applied, or (3) the change from the specific designation of the settlor was less than here. In *Rice v. Stanley* (1975), 42 Ohio St. 2d 209, 327 N.E.2d 774, the factual situation was almost the same as here and the reviewing court held that a community health facility should be built and operated with funds left in trust for the building and operating of a hospital, a use which, there as here, was deemed not to be feasible. However, there, no charitable gift over was made and it cannot be determined that the court was not applying the *cy pres* doctrine. In *Trustees of Dartmouth College v. City of Quincy* (1970), 357 Mass. 521, 258 N.E.2d 745, the deviation from the primary charitable gift which was permitted although the trust contained an alternate charitable use by the college, was to permit a girls preparatory school established by the primary gift and long in operation to admit girls from all communities although the trust instrument provided that the school accept only girls from Quincy. The evidence indicated that it would be of economic benefit to the school to admit the additional girls.

■ The proposals of the city here are more of a change from the provisions of the trust instrument than merely a matter of administration as described in the comment to section 381 of the Restatement (Second) of Trusts. Although the health facility would aid the sick, disabled and injured and serve a charitable purpose, it is not a hospital. This case would be analogous to *Village of Hinsdale* only if the proposal was to use the trust funds for the operation of another hospital serving the same clientele intended to be served by the one described in the will. It would be analogous to *Trustees of Dartmouth College* only if the hospital envisioned by the testator had been in existence and operation for many years at which time a request was made to deviate from the admission policy set forth in the trust instrument in order to be in a financial position to continue to operate the institution. We hold that the doctrine of equitable deviation is not applicable here.

Accordingly, we are required to consider the general rule that a *cy pres* application of charitable trust funds may not be made if there is an alternate charitable gift. The rule has been applied in this State in *First National Bank v. American Board of Commissioners for Foreign Missions* (1946), 328 Ill. App. 481, 66 N.E.2d 446. There, as in all cases cited by the parties, the alternate trust was capable of being performed literally. Under those circumstances, the general rule makes sense. It requires the court to give preference to a *specific* but secondary charitable desire of a testator or settlor over a charitable purpose which falls within the general charitable intent expressed in the primary gift. Under the circumstances of this case, application of the general rule makes no sense because it requires the trial court to give precedence to the *general* charitable intent of the testator as expressed in his alternate gift over that expressed in his primary gift.

No contention is made here that none of the proposals submitted by the parties should be accepted. The strong language of the testator, obviously a person learned and widely experienced in the law, indicating that one of his two charitable trusts should be served, fully demonstrates that he did not want the funds to be used for noncharitable purposes. He stated a "hope" that "no court will ever indulge any technical rule of construction to defeat the trusts herein created or to prevent my estate from going to one of the two great charities to which it is devoted."

The trial court's order indicates that it believed that it was prevented by the rule from making a *cy pres* application of the trust based upon the testator's desires expressed in his charitable gift of first choice. The general statement of the rule would seem to support this interpretation. Although we are aware of no direct precedent to support our position, we have concluded that logic requires a different interpretation of the rule when a trust instrument (1) provides for a primary and alternate

charitable gift neither of which can be carried out, and (2) also indicates a strong desire that the charitable intent of the document be followed.

The trial court's ruling was also partly based upon (1) its finding that the city's resolutions constituted a refusal of the gift, and (2) the provision in the will directing the trustee, upon the city's refusal, to incorporate an "Industrial School for Girls" and make conveyance of the trust assets to that institution. We deem the court's finding of a refusal having been made to be proper because the city's proposals set forth in the resolutions constituted more than an equitable deviation from the terms of the will. However, a charitable entity's refusal to accept a trust according to the terms of the trust instrument does not preclude a court from selecting that entity as the appropriate one to make a *cy pres* use of the assets. In *Town of Brookline v. Barnes* (1951), 327 Mass. 201, 97 N.E.2d 651, a will made a gift to a town for substantially the same purpose as the gift here. The town refused the gift for reasons very similar to the city's inability here to accept the gift according to its terms. The trial court, invoking *cy pres*, approved a master's recommendation that the town be awarded the assets for establishment and maintenance of a health center similar to that proposed here. The Supreme Judicial Court of Massachusetts affirmed. While there, unlike here, no charitable gift over was made, we do not agree with Morgan-Washington's contention that the existence of the gift over should give it preference over the city because of the city's refusal. Morgan-Washington, like the city, would be unable to comply with the terms of either charitable gift and could also make only a *cy pres* use of the property.

A trial court is allowed considerable discretion in making a *cy pres* application and a reviewing court will step in only if the discretion is abused. (Bogert, Trusts & Trustees §442, at 593 (2d ed. rev. 1977).) We do not deem it appropriate for us to rule as to the application that should be made here. However, that application should be made by a trial court unrestricted by the rigors of rules which we here hold to be inapplicable to this case. Accordingly, we reverse the portion of the decree making award of the residue of the estate and remand for a rehearing.

At rehearing, the court should determine which proposal or proposals present a viable method of most nearly following the interest of this generous testator. The court should consider that the gift to the city for the purpose of building a hospital was his first choice, but should also consider how closely each proposal comes to meeting the design of either of the "two great charities" he envisioned. The court would not be precluded from dividing the gift. In order to save time and expense, we suggest that the parties should continue in the spirit of making all possible stipulations and should agree that the court may consider testimony previously given when feasible to do so.

We must also reverse the denial of the request of the School District for attorney's fees because ruling on that is appropriate only at the conclusion of the case. We point out, however, that the request was based upon the case of *Ingraham v. Ingraham* (1897), 169 Ill. 432, 48 N.E. 561, where the supreme court found it not to have been error for the trial court to have awarded attorney's fees to a successful petitioner who sought to have a will construed. The court based the award against the estate upon the theory that the testator had created the situation requiring the suit by expressing his intentions in an ambiguous manner. Here, the will was not ambiguous. The problem giving rise to the suit occurred because of a change in conditions arising due to a lapse in time.

No briefs have been filed in opposition to the award of fees to the trustee and his attorney. That portion of the decree covering fees earned up to the time of the award is affirmed.

Affirmed in part, reversed in part, and remanded.

REARDON, P. J., and MILLS, J., concur.