(Nos. 52646, 52648 cons.—

LUMAN BURR v. JAMES R. BROOKS *et al.* (Joseph F. Bohrer, Trustee, *et al.*, Appellees; The City of Bloomington *et al.*, Appellants).

*Opinion filed January 20, 1981.*

490

UNDERWOOD and SIMON, JJ., took no part.

Dunn, Brady, Goebel, Ulbrich, Morel, Kombrink & Hundman, of Bloomington (Richard T. Dunn, Frank M. Brady, and Mark T. Dunn, of counsel), for appellant city of Bloomington.

Ralph Turner, of Luedtke, Hartweg & Turner, of Bloomington, for appellant Morgan-Washington Home.

William J. Scott, Attorney General, of Springfield (James L. Kappel, of counsel), appellee.

Davis & Morgan, of Peoria, and Jay G. Swardenski and Kathleen M. McKenna, of Seyfarth, Shaw, Fairweather & Geraldson, of New York, for appellee Bloomington Board of Education.

MR. CHIEF JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff, Joseph F. Bohrer, trustee of a testamentary trust created under the will of John M. Scott, deceased, brought this action in the circuit court of McLean County seeking instructions concerning the administration of the trust. Named as parties defendant were the Attorney General and the city of Bloomington (City). Morgan-Washington Home (Morgan-Washington), a not-for-profit corporation, and Bloomington Board of Education, School District No. 87 (the School District), were permitted to intervene. The circuit court awarded six sevenths of the trust residue to Morgan-Washington and one seventh to the School District. The City appealed, the School District and Morgan-Washington cross-appealed, and the appellate court affirmed in part, reversed in part, and remanded the cause for further proceedings (75 Ill. App. 3d 80). We allowed the petitions of the City and Morgan-Washington for leave to appeal.

John M. Scott died testate on January 21, 1898. He had served 10 years as a county judge, 8 years as a circuit judge and 18 years as a justice of the Supreme Court of Illinois, including three terms as chief justice. The will, executed in 1890, provided for a life estate for his wife in his residuary estate and for the payment of fixed annuities to certain annuitants, the last of whom died on December 14, 1976. The 11th paragraph of the will, which became operative on the death of the last surviving annuitant, directed the trustee to convert most of the real estate and all of the tangible personal property to cash or interest-bearing securities. Those funds were to be paid to the City of Bloomington and used by the City to "erect and construct" a hospital on the site of the home in which the testator had resided, and an adjoining lot. This was to be called "Scott City Hospital" and was to be operated by the City, with the advice of the elders of the Second Presby-

terian Church. The amount expended for erection and furnishing of the hospital was to be no more "than the amount of said trust estate will justify in the judgment of reasonable persons who may be approved by said city to have charge of the erection and furnishing of said hospital buildings." The funds remaining after erection and furnishing of the building were to be held in trust as an endowment for the operation of the hospital. The hospital was to be for the use of "all sick or otherwise disabled persons," especially those "who may be injured by accident and who may have no friends at hand to care for them or who may have no money or other means to pay for care and medical or surgical services." Those who wished to be admitted and were able to pay were to be charged a "reasonable sum" for services.

The 12th paragraph of the will provided that in the event the city council by resolution "declined to accept the trust hereby created for the erection and maintenance of said hospital," the trustee was to procure an act of incorporation for "establishing and maintaining an 'Industrial School for Girls.'" The trustee was directed to convey property to the corporation for a site for the school and pay over to the corporate officers all of the trust funds which would have been paid to the City had it accepted. The 12th paragraph also provided for the advice of the elders of the Second Presbyterian Church of Bloomington and again specified that only a "reasonable sum" be expended on the building, with the balance to serve as an endowment for the support of the school.

In its answer the City requested that the assets of the trust be distributed to it in accordance with the will. On February 17, 1978, after it had filed its answer to plaintiff's petition, the City, in response to an order of the circuit court that it notify the trustee of its intention to accept or reject the gift, filed a resolution of its council which purported to accept the trust. The resolution stated

that there were "sufficient hospitals" in the area and that the real estate described in the will as the site where it was to be situated was "not now suitable" for a hospital. The resolution recited several "findings" made by the city council pertaining to the community's need for "comprehensive, primary health care services" and improved emergency medical services. In order to meet these needs the resolution proposed that the trust be administered by the City "under the continuing jurisdiction of the circuit court' and that (a) part of the trust income be used to provide health care for those unable to pay and who were not eligible for assistance; (b) a portion of the principal be used to establish a family care and diagnostic center which would memorialize the name of John M. Scott and provide free services to the indigent and charge a reasonable sum to others; and (c) as an alternative or supplement to (b) an emergency medical services program would be established.

Answers filed by Morgan-Washington and the School District requested that the court find (1) that it is either impossible, impractical or illegal to carry out Justice Scott's specific charitable intent, and (2) that a general charitable intent was expressed which would justify application of the *cy pres* doctrine. The School District alleged the existence of a general charitable intent "to improve industrial education in the City of Bloomington," and requested that the trust funds be used as an endowment fund for the advancement of vocational education in the Bloomington area and to finance projects "in the best interests of the area's vocational educational needs." Morgan-Washington alleged the general charitable intent under the 12th paragraph to be "to improve health care facilities and housing and educational training for girls in the City of Bloomington," and alleged that there was no organization or entity which fulfilled the general charitable intent expressed in the 11th paragraph. It requested that the trust funds be used for housing and educational

projects and programs at Morgan-Washington and, in the alternative, that the will be construed as having a general charitable scheme intended to benefit both types of charities named in the 11th and 12th paragraphs of the will and that it be included as a beneficiary.

At trial, evidence was presented concerning the need for another hospital in Bloomington. At the time the will was executed there was one hospital in Bloomington, but at the time of trial there were three in the Bloomington-Normal area, with a combined occupancy rate of 73%. Several witnesses expressed the opinion that there was no need for another hospital and that, if one were constructed, it would not be possible to obtain a license or permit to operate it. Testimony was presented concerning the number of indigents who, though unable to pay for medical care, nevertheless failed to qualify for assistance. The City also presented a supplemental resolution of its council which described in detail the nature of the facility it proposed in order to meet the community's health-care needs. That facility would provide "multi-phasic health screening services" designed to facilitate the early detection and treatment of illness.

Morgan-Washington was shown to be the successor to the Women's Industrial Home of McLean County, which was created in 1889 pursuant to "An Act to aid industrial schools for girls" (1879 Ill. Laws 309; now Ill. Rev. Stat. 1979, ch. 122, par. 646 *et seq.*). Industrial homes, as originally conceived, provided custodial care and vocational training for their residents. In the girls' schools, a typical curriculum included sewing, cooking, housekeeping and ironing. These subjects were not taught in the public schools of the time, which were largely college preparatory. There are presently no industrial schools of that type, and the public schools have since taken over vocational education. Morgan-Washington presently is licensed by the Illinois Department of Children and Family Services

as a residential facility and expected to be licensed as a child-welfare agency, which would permit it to recruit and license foster families. Most Morgan-Washington residents are classified as minors in need of supervision, or delinquents. They are educated either in the local public schools or at the home in cooperation with the School District.

The School District presented evidence that it has a broad program of vocational and industrial education which considerably exceeds that offered in an 1890's industrial school for girls.

The circuit court found that the City's proposal was a "refusal of the trust," which operated to invoke the 12th paragraph of the will. Because the operation of an industrial school for girls, as the testator used that term, was impossible or impractical at present, the court ordered distribution of the funds to the School District and Morgan-Washington under the doctrine of *cy pres.* The appellate court affirmed that portion of the circuit court's judgment which held that the City's proposal constituted a technical refusal of the trust and that the implementation of the testator's alternative charitable purpose was impractical or impossible. The appellate court reversed that portion of the circuit court's judgment which applied the doctrine of *cy pres* to the second charitable purpose but not to the first, saying:

"At rehearing, the court should determine which proposal or proposals [the City's or the intervenors'] present a viable method of most nearly following the interest of this generous testator. The court should consider that the gift to the city for the purpose of building a hospital was his first choice, but should also consider how closely each proposal comes to meeting the design of either of the 'two great charities' he envisioned. The court would not be precluded from dividing

the gift." 75 Ill. App. 3d 80, 88.

The City contends that there can be no failure of the gift made under paragraph 11 "so long as the charitable purpose embodied therein may be fulfilled," that "equity will consider the charitable purpose of the donor as the substance of the gift," and that "the mode of effectuating that purpose is a mere incident of the gift." It contends that the testator's "primary charitable objective," as articulated in the 11th paragraph of the will, was "the provision of care and medical or surgical services to the sick, disabled and injured, especially those unable to pay therefor." It argues that the City's proposal as to the implementation of the trust should be approved under the doctrine of equitable deviation.

The doctrine of equitable deviation is stated in section 381 of the Restatement (Second) of Trusts, at 273 (1959), as follows:

> "The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purpose of the trust."

The doctrine of *cy pres* is expressed in section 399 of the Restatement (Second) of Trusts, at 297 (1959), as follows:

> "If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor."

The distinction between *cy pres* and equitable deviation is explained by comment *a* to section 381, which states in part:

"The rule stated in this Section has to do with the powers and duties of the trustees of charitable trusts with respect to the administration of the trust; it has to do with the methods of accomplishing the purposes of the trust. The question of the extent to which the court will permit or direct the trustee to apply the trust property to charitable purposes other than the particular charitable purpose designated by the settlor where it is or becomes impossible or illegal or impracticable to carry out the particular purpose involves the doctrine of cy pres, which is dealt with in section 399." Restatement (Second) of Trusts sec. 381, comment *a*, at 273 (1959).

Citing *Village of Hinsdale v. Chicago City Missionary Society* (1940), 375 Ill. 220, the City argues that the testator's "primary charitable objective" as set forth in paragraph 11 must prevail over the "secondary purpose" provided in paragraph 12. In *Hinsdale* the settlor conveyed certain parcels of property to the village of Hinsdale by deed which provided that a specific lot should be retained as a library site, and the proceeds of the sale of the remaining lots used as a trust fund for the construction and maintenance of the library. The deed further provided that if at any time the lot on which the library was to be situated should cease to be used for library purposes, it would pass to a church. The appropriate lots were sold according to the settlor's instructions, but the proceeds of sale were insufficient to construct a library. The funds were invested and the income accumulated. Before a library was constructed, the village erected a multipurpose municipal building in which the public library leased space. The village then brought an action seeking approval to use the accumulated funds to maintain the library at its new location in the municipal building. The church counterclaimed, seeking title to the unsold lot, and the settlor's heirs at law sought the accumulated funds.

The statement upon which the City relies is:

"A clearly expressed desire of the donor that his

property be devoted to another purpose, unless execution of the charitable use first named is feasible in the manner specified, will be recognized, but a secondary purpose will not prevail where the primary charitable objective of the donor can be attained by a different method." (375 Ill. 220, 234.)

Notwithstanding this language the court declined to apply either the doctrine of equitable deviation or *cy pres* to the lot which was subject to the alternative disposition. The court held that title to the lot would pass to the church if the village did not use it for a library site. The accumulated funds were applied *cy pres* to the public library, but those funds were not subject to an alternative disposition. Thus, *Village of Hinsdale* is not dispositive of the issues presented in this case.

In holding that the doctrine of equitable deviation did not apply to the City's proposed use of the funds the appellate court said:

"The city cites many cases from other jurisdictions in support of its theory that its proposals met the requirements for equitable deviation. However, in those cases, either (1) the *cy pres* doctrine was applied, (2) it is impossible to determine that it was not being applied, or (3) the change from the specific designation of the settlor was less than here. In *Rice v. Stanley* (1975), 42 Ohio St. 2d 209, 327 N.E. 2d 774, the factual situation was almost the same as here and the reviewing court held that a community health facility should be built and operated with funds left in trust for the building and operating of a hospital, a use which, there as here, was deemed not to be feasible. However, there, no charitable gift over was made and it cannot be determined that the court was not applying the *cy pres*

doctrine. In *Trustees of Dartmouth College v. City of Quincy* (1970), 357 Mass. 521, 258 N.E.2d 745, the deviation from the primary charitable gift which was permitted although the trust contained an alternate charitable use by the college, was to permit a girls preparatory school established by the primary gift and long in operation to admit girls from all communities although the trust instrument provided that the school accept only girls from Quincy. The evidence indicated that it would be of economic benefit to the school to admit the additional girls.

The proposals of the city here are more of a change from the provisions of the trust instrument than merely a matter of administration as described in the comment to section 381 of the Restatement (Second) of Trusts. Although the health facility would aid the sick, disabled and injured and serve a charitable purpose, it is not a hospital. This case would be analogous to *Village of Hinsdale* only if the proposal was to use the trust funds for the operation of another hospital serving the same clientele intended to be served by the one described in the will. It would be analogous to *Trustees of Dartmouth College* only if the hospital envisioned by the testator had been in existence and operation for many years at which time a request was made to deviate from the admission policy set forth in the trust instrument in order to be in a financial position to continue to operate the institution. We hold that the doctrine of equitable deviation is not applicable here." (75 Ill. App. 3d 80, 86-87.)

We agree. Paragraph 11 of the will provides that the funds be given to the City "to be by said city held in trust for the uses and purposes hereinafter named that is to say

that said City of Bloomington with said trust funds or such portion as shall be deemed necessary for that purpose ***, erect and construct upon [the specified property], a building suitable for a hospital and to be used for hospital purposes ***." That the testator's intended purpose in making the gift was the construction of a hospital is further indicated by the provision in paragraph 12, by which the gift over becomes operative if "the City of Bloomington shall by resolution to be entered of record decline to accept the trust hereby created for the erection and maintenance of said hospital." We do not agree with the City that the testator's "primary charitable objective" was "the provision of care and medical or surgical services to the sick, disabled and injured, especially those unable to pay therefor."

The parties are in agreement that the general rule, followed in this jurisdiction, is that where the literal execution of the charity becomes inexpedient or impracticable and the settlor has manifested a general intention to devote the property to charitable purposes the trust will not be permitted to fail, but that the courts will execute it *cy pres*. (*Village of Hinsdale v. Chicago City Missionary Society* (1940), 375 Ill. 220.) It is also well established that *cy pres* will not apply if provision is made for an alternate charitable gift. *First National Bank v. American Board of Commissioners for Foreign Missions* (1946), 328 Ill. App. 481. Accord, *Simmons v. Parsons College* (Ia. 1977), 256 N.W.2d 225; *Smyth v. Anderson* (1977), 238 Ga. 343, 232 S.E.2d 835; *Mississippi Children's Home Society v. City of Jackson* (1957), 230 Miss. 546, 93 S. 2d 483; *City of Belfast v. Goodwill Farm* (1954), 150 Me. 17, 103 A.2d 517; *Board of Trustees v. Cheney* (1954), 158 Neb. 292, 63 N.W.2d 177; *Edwards v. DeSimone* (1969), 105 R. I. 335, 252 A.2d 327; *In re Estate of Berry* (1966), 29 Wis. 2d 506, 139 N.W.2d 72.

There is no contention that any proposal made by any

of the parties will effect literal compliance with either paragraph 11 or 12, and neither Morgan-Washington nor the School District contends that it is entitled to the funds under the express terms of paragraph 12 or under the doctrine of equitable deviation. It is clear that the doctrine of *cy pres* would apply to the general charitable purpose stated in either paragraph 11 or 12 of the will. The City argues that "the primary charitable objective attainable through *cy pres* should prevail over a secondary charitable objective attainable only through *cy pres.*" Morgan-Washington argues that the general rule that a gift will not be executed *cy pres* where there is an alternate charitable gift controls here. It argues further that the provision of an alternative indicates an intent to avoid application of *cy pres* to the first gift. Finally, the School District argues that the funds should be distributed in a manner which furthers all the interests which the testator sought to benefit.

The parties call our attention to a provision in the 17th paragraph of the will which provides in part:

> "I wish also to express the earnest hope that *** no court will ever indulge any technical rule of construction to defeat the trusts herein created or to prevent my estate from going to one of the two great charities to which it is devoted."

With reference to this provision, the City argues that the reference to "one of the two great charities" reflects an intent not to divide the gift among more than one donee. The City's argument that the gift to the City should be executed *cy pres* because it was mentioned first would, indeed, "indulge a technical rule of construction," contrary to the testator's express wish.

The parties have not called our attention to and our research has not revealed any authority apposite to the problem here. We are of the view, however, that the provision in the 17th paragraph of the will is not dispositive.

502

It is obviously intended to prevent the total failure of the testator's charitable trust, but we think it has no application in the determination of which of two or more charitable *cy pres* dispositions is to have priority.

We agree with the appellate court that the determination of the manner of the application of *cy pres* should be made by the circuit court and with its statement of the guidelines to be followed in making such determination. (75 Ill. App. 3d 80, 88.) The judgment of the appellate court is therefore affirmed and the cause is remanded to the circuit court of McLean County for further proceedings.

*Affirmed and remanded.*

UNDERWOOD and SIMON, JJ., took no part in the condideration or decision of this case.